In the

# United States Court of Appeals
## For the Seventh Circuit
_____

No. 07-2658

CAVEL INTERNATIONAL, INC., *et al.*,

*Plaintiffs-Appellants*,

*v.*

LISA MADIGAN, *et al.*,

*Defendants-Appellees*.

_____

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 07 C 50100—**Frederick J. Kapala**, *Judge*.

_____

ARGUED AUGUST 16, 2007—DECIDED SEPTEMBER 21, 2007

_____


Before EASTERBROOK, *Chief Judge*, and POSNER and ROVNER, *Circuit Judges*.

POSNER, *Circuit Judge*. Horse meat was until recently an accepted part of the American diet—the Harvard Faculty Club served horse-meat steaks until the 1970s. No longer is horse meat eaten by Americans, Christa Weil, "We Eat Horses, Don't We?," *New York Times*, Mar. 5, 2007, p. A19, though it is eaten by people in a number of other countries, including countries in Europe; in some countries it is a delicacy. Meat from American horses is especially prized because our ample grazing land enables them to eat

natural grasses, which enhances the flavor of their meat. Mary Jacoby, "Why Belgians Shoot Horses in Texas For Dining in Europe," *Wall St. J.*, Sept. 21, 2005, p. 1.

Cavel International, the plaintiff in this case, owns and operates the only facility in the United States for slaughtering horses. Until recently it was one of three such facilities, but the other two, both in Texas, stopped slaughtering horses after the Fifth Circuit upheld a Texas law similar to the Illinois law challenged in this case. *Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry*, 476 F.3d 326, 336-37 (5th Cir. 2007).

Cavel's slaughterhouse, located in DeKalb, Illinois, near Chicago, has some sixty employees and slaughters some 40,000 to 60,000 horses a year, out of a total of about 700,000 horses that either are killed or die of natural causes in the United States annually. Cavel buys its horses for about $300 apiece from brokers who obtain them at auctions. The company has been in operation for 20 years and has some $20 million in annual revenues.

Horses are the only animals that Cavel slaughters, and it represented to us without contradiction that if it loses this case it will have to shut down. The Texas slaughterhouses were more eclectic—they slaughtered, besides horses, such sources of "atypical meat products" as bison and ostrich. But they too represented to the courts that if forbidden to slaughter horses they would have to shut down, though it appears that after a brief shutdown they reopened, adding cattle to their menu, as it were. Illinois House Bill 1711, Bill for an Act Concerning Horses, 95th General Assembly 16 (April 18, 2007) (statement of Representative Molaro).

In the United States, horses are killed in slaughterhouses only when the horses' flesh is destined for eating

by human beings or (a detail to be considered later) zoo animals. The flesh of horses that is intended for pet food is obtained from the corpses hauled to rendering plants for disposal; the plants also produce glue and other products from the carcasses. (All these businesses are in terminal decline. Jeffrey McMurray, "Some Horses Left to Starve as Market for Meat Shrivels," *Chi. Tribune*, Mar. 15, 2007, p. 3.) Unlike Cavel's slaughterhouse, a rendering plant's methods of producing meat from dead horses do not have to comply with the requirements that the federal Meat Inspection Act, 21 U.S.C. § 601, prescribes for the production of meat, expressly including horse meat, §§ 601(j), (w), intended for human consumption. The Act is fully applicable to Cavel, see 21 U.S.C. § 617, even though, because there is no U.S. domestic market for horse meat as a human food, Cavel's entire output is exported to such countries as Belgium, France, and Japan. Indeed, Cavel is the subsidiary of a Belgian company.

On May 24 of this year, the Illinois Horse Meat Act, 225 ILCS 635, was amended to make it unlawful for any person in the state either "to slaughter a horse if that person knows or should know that any of the horse meat will be used for human consumption," § 635/1.5(a), or "to import into or export from this State, or to sell, buy, give away, hold, or accept any horse meat if that person knows or should know that the horse meat will be used for human consumption." § 635/1.5(b). (Prior to the amendment, the statute merely required a license to slaughter horses and imposed various inspection, labeling, and other regulatory restrictions on licensees. The prohibition has made these provisions academic). Cavel claims that the amendment violates both the federal Meat Inspection Act and the commerce clause—the provision in Article I, section 8, of the federal Constitution that in terms merely empowers Congress to

regulate interstate and foreign commerce but that has been interpreted to limit the power of states to regulate interstate and foreign commerce even in the absence of federal legislation inconsistent with the state regulation. *Willson v. Black Bird Creek Marsh Co.*, 27 U.S. (2 Pet.) 245, 252 (1829) (Marshall, C.J.); *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Management Authority*, 127 S. Ct. 1786, 1792-93 (2007).

Cavel moved for a preliminary injunction against the enforcement of the amendment. The district court declined to issue it, on the ground that Cavel had failed to make a strong showing that it was likely to prevail on the merits. Cavel appealed, and we enjoined the application of the amendment to Cavel pending our decision of its appeal, 2007 WL 2239215 (7th Cir. July 18, 2007), Chief Judge Easterbook dissenting.

The challenge based on the Meat Inspection Act need detain us only briefly. Cavel points to the Act's preemption clause—"requirements within the scope of this Act with respect to premises, facilities and operations of any establishment at which inspection is provided under title I of this Act [including facilities at which horses are slaughtered, 21 U.S.C. §§ 601(d), (j)] which are in addition to, or different than those made under this Act may not be imposed by any State or Territory or the District of Columbia," § 678—and argues that it signifies Congress's decision to sweep aside any state law that would render the federal requirements inapplicable to Cavel's slaughterhouse by forbidding horses to be slaughtered. The argument confuses a premise with a conclusion. When the Meat Inspection Act was passed (and indeed to this day), it was lawful in some states to produce horse meat for human consumption, and since the federal government

has a legitimate interest in regulating the production of human food whether intended for domestic consumption or for export—exporting meat unfit for human consumption would be highly damaging to the nation's foreign commerce—it was natural to make the Act applicable to horse meat. That was not a decision that states must allow horses to be slaughtered for human consumption. The government taxes income from gambling that violates state law; that doesn't mean the state must permit the gambling to continue. *Given* that horse meat is produced for human consumption, its production must comply with the Meat Inspection Act. But if it is not produced, there is nothing, so far as horse meat is concerned, for the Act to work upon.

Of course in a literal sense a state law that shuts down any "premises, facilities and operations of any establishment at which inspection is provided" is "different" from the federal requirements for such premises, but so literal a reading is untenable. If despite its title the Meat Inspection Act were intended to forbid states to shut down slaughterhouses, it would have to set forth standards and procedures for determining whether a particular slaughterhouse or class of slaughterhouses should be shut down; and it does not. The Act is concerned with inspecting premises at which meat is produced for human consumption, see, e.g., 21 U.S.C. § 606, rather than with preserving the production of particular types of meat for people to eat. *Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry*, *supra*, 476 F.3d at 333.

The more difficult question is whether the horse-meat amendment violates the commerce clause as interpreted to prohibit state regulations that unduly interfere with the foreign commerce of the United States. Cavel fastens on

subsection (b) of the Illinois amendment, which forbids the importing and exporting of horse meat for human consumption. But that provision is not addressed to Cavel; it is addressed to a middleman who having procured horse meat from Cavel tries to export it, or that imports horse meat to Illinois hoping to induce Americans to eat it. (We assume that the terms "import" and "export" refer to bringing horse meat into Illinois from another state, or shipping it to another state, as well as to importing horse meat from and exporting it to a foreign country.) The provision directed at Cavel is subsection (a), which forbids the slaughtering of horses for human consumption. If that subsection is valid, Cavel loses its case.

The clearest case of a state law that violates the commerce clause is a law that discriminates in favor of local firms. E.g., *Chemical Waste Management, Inc. v. Hunt*, 504 U.S. 334 (1992); *Bendix Autolite Corp. v. Midwesco Enterprises, Inc.*, 486 U.S. 888 (1988); *American Trucking Ass'ns v. Scheiner*, 483 U.S. 266 (1987); *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 521-22 (1935) (Cardozo, J.). Suppose a state passed a law that forbade the importation of wild baitfish. That would be a discrimination against interstate and foreign commerce. This would not make the law unconstitutional per se, because the state might be able to prove that it needed the law in order to protect "unique and fragile fisheries" from parasites prevalent in out-of-state fisheries and that there was "no satisfactory way to inspect shipments of live baitfish" for those parasites—that is *Maine v. Taylor*, 477 U.S. 131, 141 (1986). The case turned on factual issues of a kind that a court can resolve without undue risk of error.

There is no discrimination in the present case insofar as the prohibition against slaughter is concerned. If a local firm (remember that Cavel is foreign-owned) wanted to

slaughter horses, it could not do so. No local merchant or producer benefits from the ban on slaughter. Compare *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333 (1977), with *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117 (1978).

The absence of outright discrimination does not terminate inquiry into a possible violation of the commerce clause. There are situations in which states by ostensibly local regulations distort the operation of interstate markets. An example is a severance tax on a raw material, such as oil or coal, of which the state (perhaps in conjunction with other states) has a monopoly or near monopoly and which is almost entirely exported rather than consumed locally. The incidence of the tax will fall on the consumers in other states, who have no voice in the politics of the producing state, and the result may be a level of taxation and resulting price to consumers that greatly exceeds the cost of the services the state provides to producers of the raw material, and that by doing so burdens the export of the raw material to other states. Or imagine a state's imposing onerous taxes on all trucks that use its highways, knowing that almost all the truck traffic originates and terminates in other states and exploiting a locational monopoly to shift the costs of public services unrelated to highway maintenance to suppliers and consumers in other states.

Such cases present more difficult factual issues than cases of outright discrimination. Plaintiffs have sometimes prevailed, at least if the impact on commerce is evident. E.g., *Raymond Motor Transportation, Inc. v. Rice*, 434 U.S. 429 (1978); *Kassel v. Consolidated Freightways Corp.*, 450 U.S. 662, 664 (1981); but see *South Carolina State Highway Department v. Barnwell Bros., Inc.*, 303 U.S. 177 (1938). But in the case of the severance tax the "local" character of the

activity taxed, although it does not immunize the tax from scrutiny, *Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 617 (1981), causes a judicial hiccup, see *id.* at 618-19, even though the incidence of the tax is not local. In this case, too, the activity restricted by the state—the slaughter of horses in Illinois—has a local character but primarily foreign consequences. There can be harmful effects on free trade among the states that do not stem from even a mild disparity in treatment—as in this case, or the highway cases that we cited earlier, where there is no discrimination in favor of a local supplier. But the plaintiff has a steep hill to climb. "Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is *clearly* excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970) (emphasis added); see also *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 471-74 (1981).

We have expressed doubt that even this tough test is available to plaintiffs unless they show at least "mild" discrimination against interstate commerce; *Pike* seems to require that at least "incidental" "effects on interstate commerce be shown." *National Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124, 1131 (7th Cir. 1995); *Grant's Dairy-Maine, LLC* v. *Commissioner of Maine Dep't of Agriculture, Food & Rural Resources*, 232 F.3d 8, 18 (1st Cir. 2000); *Automated Salvage Transport, Inc. v. Wheelabrator Environmental Systems, Inc.*, 155 F.3d 59, 75 (2d Cir. 1998); *Instructional Systems, Inc. v. Computer Curriculum Corp.*, 35 F.3d 813, 825-26 (3d Cir. 1994). Some cases disagree, and take "even-handedly" at face value, *Eastern Kentucky Resources v. Fiscal Court*, 127 F.3d 532, 544-45 (6th Cir. 1997); *American Target Advertising, Inc. v. Giani*, 199 F.3d 1241, 1254 (10th

Cir. 2000), heartened by a footnote in *GMC v. Tracy*, 519 U.S. 278, 299 n. 12 (1997), in which the Supreme Court noted that "a small number of our [i.e., the Supreme Court's] cases have invalidated state laws under the dormant Commerce Clause that appear to have been genuinely nondiscriminatory, in the sense that they did not impose disparate treatment on similarly situated in-state and out-of-state interests, where such laws undermined a compelling need for national uniformity in regulation."

There may be no real disagreement in the case law. *National Paint & Coatings Ass'n* acknowledges that even in the absence of discrimination, a burden on interstate commerce that had no rational justification would be invalid. 45 F.3d at 1131. An example is the Illinois mudguard law invalidated in *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520 (1959). The law required all trucks in the state, thus including those traveling interstate, to be equipped with curved mudguards that the district court had found not only conferred "no" safety benefits over straight ones but actually created "hazards previously unknown." *Id*. at 525. The law impeded interstate commerce—though maybe local commerce just as much—and because it lacked a rational basis it was invalid despite the lack of proof of a disparate impact. *National Paint & Coatings Ass'n v. City of Chicago, supra*, 45 F.3d at 1131; *Norfolk Southern Corp. v. Oberly*, 822 F.2d 388, 404-05 (3d Cir. 1987).

Any law, moreover, that irrationally burdens property rights can, quite apart from the commerce clause, be challenged as a deprivation of property without due process of law. *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 540-45 (2005); *Greater Chicago Combine & Center, Inc. v. City of Chicago*, 431 F.3d 1065, 1071-72 (7th Cir. 2005). That

makes us wonder just what work *Pike* does, but that is not an issue we need pursue.

Cavel argues, in the spirit of *Bibb*, that Illinois's ban on slaughtering horses for human consumption serves no purpose at all. The horses will be killed anyway when they are too old to be useful and what difference does it make whether they are eaten by people or by cats and dogs? But the horse meat used in pet food is produced by rendering plants from carcasses rather than by the slaughter of horses, and the difference bears on the effect of the Illinois statute. Cavel pays for horses; rendering plants do not. If your horse dies, or if you have it euthanized, you must pay to have it hauled to the rendering plant, and you must also pay to have it euthanized if it didn't just die on you. So when your horse is no longer useful to you, you have a choice between selling it for slaughter and either keeping it until it dies or having it killed. The option of selling the animal for slaughter is thus financially more advantageous to the owner, and this makes it likely that many horses (remember that Cavel slaughters between 40,000 and 60,000 a year) die sooner than they otherwise would because they can be killed for their meat. States have a legitimate interest in prolonging the lives of animals that their population happens to like. *Hughes v. Oklahoma*, 441 U.S. 322, 337 (1979); cf. 7 U.S.C. § 2131; *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 538 (1993); *Hoctor v. U.S. Dept. of Agriculture*, 82 F.3d 165, 168 (7th Cir. 1996). They can ban bullfights and cockfights and the abuse and neglect of animals.

Of course Illinois could do much more for horses than it does—could establish old-age pastures for them, so that they would never be killed (except by a stray cougar), or provide them with free veterinary care. But it is permit-

ted to balance its interest in horses' welfare against the other interests of its (human) population; and it is also permitted to take one step at a time on a road toward the humane treatment of our fellow animals. E.g., *Greater Chicago Combine & Center, Inc. v. City of Chicago*, *supra*, 431 F.3d at 1073; cf. *Bowen v. Owens*, 476 U.S. 340, 346-47 (1986); *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 488-89 (1955); *Milner v. Apfel*, 148 F.3d 812, 818-19 (7th Cir. 1998); *Johnson v. Daley*, 339 F.3d 582, 596 (7th Cir. 2003).

There is a wrinkle in this analysis, however, though unremarked by the parties. Zoos feed a considerable amount of horse meat to their charges. Brad Haynes, "Zoos in a Pickle Over Horse Meat," *Seattle Times*, Aug. 14, 2007, http://seattletimes.nwsource.com/html/localnews/200 3835227_horsemeat14m.html (visited Sept. 18, 2007). For living proof, we reproduce a photograph from Haynes's article, with its caption:



"Kwanzaa, a young South African lion at Cameron Park Zoo in Waco, Texas, celebrates his birthday with a cake made from 10 pounds of horse meat, plus whipped cream and a carrot."

As the article explains, American zoos, seeing the handwriting on the wall so far as the domestic slaughter of horses is concerned, are shifting to importing horse meat. So the slaughter of horses will continue. For all we know, Cavel may seek out a new market in America's zoos. We do not know why, with the cessation of horse slaughtering at the Texas slaughterhouses, Cavel has not done so already.

But even if no horses live longer as a result of the new law, a state is permitted, within reason, to express disgust at what people do with the dead, whether dead human beings or dead animals. There would be an uproar if restaurants in Chicago started serving cat and dog steaks, even though millions of stray cats and dogs are euthanized in animal shelters. A follower of John Stuart Mill would disapprove of a law that restricted the activities of other people (in this case not only Cavel's owners and employees but also its foreign consumers) on the basis merely of distaste, but American governments are not constrained by Mill's doctrine.

The careful reader will have noted that we have so far been discussing the legal principles governing state burdens on interstate commerce, though the Illinois statute burdens foreign commerce. Quite apart from economic consequences, an interference by a state with foreign commerce can complicate the nation's foreign relations, which are a monopoly of the federal government; states are not permitted to have their own foreign policy, their own embassies and consuls and ambassadors, and so forth. "Foreign commerce is pre-eminently a matter of national concern. 'In international relations and with respect to foreign intercourse and trade the people of the United States act through a single government

with unified and adequate national power.' *Board of Trustees v. United States*, 289 U.S. 48, 59 (1933)." *Japan Line, Ltd. v. County of Los Angeles*, 441 U.S. 434, 448-51 (1979); see also *Itel Containers Int'l Corp. v. Huddleston*, 507 U.S. 60 (1993).

Suppose Cavel were the only source of horse meat for human consumption in Europe and the law provoked European governments into remonstrating with our State Department, which in response submitted to us an amicus curiae brief denouncing the law. See *Container Corp. of America v. Franchise Tax Board*, 463 U.S. 159, 195 (1983). True, a *Japan Line* challenge failed in *Barclays Bank PLC v. Franchise Tax Bd.*, 512 U.S. 298, 324-28 (1994), even though a number of our trading partners complained loudly about a state law that increased the costs to foreign companies of filing U.S. tax returns. But the case was special because Congress had repeatedly refused to grant the relief sought by those companies. Although Congress had not explicitly authorized the state practice, the Court ruled that Congress's lengthy consideration, followed by inaction, was an implicit authorization that defeated the commerce-clause challenge.

But assuming therefore that the doctrine of *Japan Line* survives the *Barclays Bank* case, this cannot help Cavel, which did not tell the district court and has not told us what percentage of the horse meat consumed by Europeans it supplies and thus whether its being closed down is likely to have a big effect on the price of horse meat in Europe. And while it is true that the foreign minister of Belgium wrote a letter to Governor Blagojevich inquiring about the status of the bill that became the horse-meat amendment, he did not say that his government was opposing the bill. So far as we know, there was no follow-

up (we have not been told whether the letter was answered and if so what it said); and we have heard nothing from any other foreign government or from the State Department.

The curtailment of foreign commerce by the amendment is slight and we are naturally reluctant to condemn a state law, supported if somewhat tenuously by a legitimate state interest, on grounds as slight as presented by Cavel. Yet we are not entirely happy about having to uphold the Illinois statute. That the company is foreign-owned and its entire output exported means that the shareholders and consumers harmed by the amendment have no influence in Illinois politics, though there is no hint in the history of the amendment of local hostility to foreigners but only of indifference to them, in the remark of the state's agriculture director that "there is no *domestic* market for horsemeat and, *therefore*, no need for this practice to continue in Illinois." Governor's Office Press Release, "Gov. Blagojevich Signs Legislation Banning the Slaughter of Horses in Illinois for Human Consumption," May 24, 2007, www.illinois.gov/PressReleases/ ShowPressRelease.cfm?SubjectID=3&RecNum=5995 (visited Sept. 5, 2007) (emphasis added).

The fact that the governor's signing statement acknowledges the role of the Hollywood actress Bo Derek, author of the book *Riding Lessons: Everything That Matters in Life I Learned From Horses* (2002), in outlawing the slaughtering of horses could be thought to inject a frivolous note into a law that forces the closing of a business that has very little to do with the people of Illinois. But this is not a basis for invalidating a nondiscriminatory statute that interferes minimally with the nation's foreign commerce and cannot be said to have no rational basis.

Although the appeal is from the denial of a preliminary injunction, the merits of Cavel's challenge to the horse-meat law have been fully briefed and argued and there are no unresolved factual issues the resolution of which in a trial would alter the result. In such a case, courts treat the appeal as if it were from a final judgment. *Mast, Foos & Co. v. Stover Mfg. Co.*, 177 U.S. 485, 494-95 (1900); *Illinois Council On Long Term Care v. Bradley*, 957 F.2d 305, 309-10 (7th Cir 1992); *Amandola v. Town of Babylon*, 251 F.3d 339, 343-44 (2d Cir. 2001) (per curiam); *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1272-74 (11th Cir. 2005). So the judgment is affirmed, the suit dismissed with prejudice, and the injunction that we granted pending appeal dissolved.

A true Copy:

      Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*
