ATTORNEY GENERAL OF TEXAS

GREG ABBOTT

May 6, 2008

The Honorable Warren Chisum
Chair, Committee on Appropriations
Texas House of Representatives
Post Office Box 2910
Austin, Texas 78768-2910

Opinion No. GA-0623

Re: Whether a foreign corporation may transport
horsemeat for human consumption in-bond through
Texas for immediate export abroad (RQ-0623-GA)

Dear Representative Chisum:

Chapter 149 of the Texas Agriculture Code makes it a criminal offense for any person to sell horsemeat as food for human consumption, possess horsemeat with the intent to sell it as food for human consumption, or transfer horsemeat to a person who intends to sell it as food for human consumption.[1] *See* TEX. AGRIC. CODE ANN. §§ 149.002–.003 (Vernon 2004). You provide a "factual backdrop" and ask, in light of those facts, "[w]hether Chapter 149 applies to a foreign corporation that transports horsemeat for human consumption in-bond[2] through Texas for immediate export to foreign destinations."[3]

## I. Legal Background

To provide a context for your question and its factual backdrop summarized below, we review chapter 149 and administrative and judicial authorities construing the Texas statute and a similar Illinois statute.

---

[1] All subsequent references in this opinion to the sale, possession, or transfer of horsemeat is intended to refer to its sale as food for human consumption, possession with intent to sell it as food for human consumption, or transfer to a person who intends to sell it as food for human consumption consistent with sections 149.002 and 149.003 of the Agriculture Code.

[2] Merchandise destined for a foreign country may be entered and transported through the United States by posting a bond in an amount sufficient to cover the assessment of duties should the merchandise be lost or diverted before its ultimate departure abroad. *United States v. Watches, Watch Parts, Calculators & Misc. Parts*, 692 F. Supp. 1317, 1318 n.1 (S.D. Fla. 1988). Such merchandise is described as being "in-bond" and may be entered into the United States by a bonded carrier without the assessment or payment of duties. *Id.*

[3] Letter from Honorable Warren Chisum, Chair, Committee on Appropriations, Texas House of Representatives, to Honorable Greg Abbott, Attorney General of Texas, at 1–2 (Sept. 13, 2007) (footnote added) (on file with the Opinion Committee, *also available at* http://www.oag.state.tx.us) [hereinafter Request Letter].

### A.    Chapter 149

Section 149.002 of the Agriculture Code criminalizes the sale and possession of horsemeat intended for sale as food for human consumption:

> A person commits an offense if:
>
> (1)    the person sells, offers for sale, or exhibits for sale horsemeat as food for human consumption; or
>
> (2)    the person possesses horsemeat with the intent to sell the horsemeat as food for human consumption.

TEX. AGRIC. CODE ANN. § 149.002 (Vernon 2004).

Additionally, section 149.003 criminalizes the transfer of horsemeat to a person who intends to sell it for human consumption:

> A person commits an offense if the person:
>
> (1)    transfers horsemeat to a person who intends to sell the horsemeat, offer or exhibit it for sale, or possess it for sale as food for human consumption; and
>
> (2)    knows or in the exercise of reasonable discretion should know that the person receiving the horsemeat intends to sell the horsemeat, offer or exhibit it for sale, or possess it for sale as food for human consumption.

*Id.* § 149.003; *see also id.* § 149.005 (providing that an offense under chapter 149 is punishable by a fine, confinement in jail, or both).

### B.    Attorney general opinion

In a 2002 attorney general opinion, this office advised that chapter 149 applied to "horse slaughter plants in Texas that process, possess, sell, or transport horsemeat to foreign countries as food for human consumption in those countries." Tex. Att'y Gen. Op. No. JC-0539 (2002) at 3. This office advised in the same opinion that the Federal Meat Inspection Act did not preempt chapter 149. *Id.* at 4.

### C.    Judicial rulings

After learning of the attorney general opinion, two horsemeat slaughterhouses operating in Texas—Beltex and Dallas Crown—and a third operating in Mexico but selling and transferring

horsemeat to Beltex—Empacadora de Carnes de Fresnillo[4]—sued in federal district court for a judicial declaration of their legal rights and to enjoin potential prosecution under chapter 149. *See Empacadora de Carnes de Fresnillo v. Curry*, 476 F.3d 326, 329 (5th Cir.) (reciting factual background to litigation), *cert. denied*, 127 S. Ct. 243 (2007). The district court ruled in favor of the slaughterhouses, holding that the statute was implicitly repealed by other state regulations, was preempted by the Federal Meat Inspection Act, and violated the federal dormant Commerce Clause. *Id.*; *see also Empacadora de Carnes de Fresnillo v. Curry*, 2005 WL 2074884 (N.D. Tex. 2005).

In a decision issued in 2007, the Fifth Circuit Court of Appeals overruled the federal district court and upheld chapter 149 against the three slaughterhouses' statutory and federal constitutional challenges. *See Empacadora de Carnes de Fresnillo*, 476 F.3d at 328–29. The court held that chapter 149 (1) was not repealed by other state regulations and was in force, (2) was not preempted by the Federal Meat Inspection Act, and (3) did not violate the federal dormant Commerce Clause. *See id.* at 329. Significantly, as relevant here, the court's dormant Commerce Clause analysis and holding were limited to "sales and activity that take place directly in Texas." *Id.* at 335. The court expressly carved out the situation and question apparently presented here: "We do not address the potential application of Chapter 149 to an entity that *merely transports horsemeat through Texas* but engages in no other commercial activity within the State, as Empacadora speculates that it may do one day." *Id.* (emphasis added); *see also id.* (noting "[t]hat hypothetical situation is not before us" and that prosecuting a company that merely transports meat through Texas "would raise unique dormant Commerce Clause concerns—specifically with regard to the Foreign Commerce Clause").

After the Fifth Circuit Court of Appeals decision, the two Texas slaughterhouses ceased slaughtering horses. *See Cavel Int'l, Inc. v. Madigan*, 500 F.3d 551, 552 (7th Cir. 2007) (reciting factual background to Illinois litigation). Thereafter, the only remaining horse slaughterhouse in the United States shut down its operation after the Seventh Circuit Court of Appeals upheld an Illinois statute, similar to the Texas statute, prohibiting the slaughter of horses and the sale, import, export, and possession of horsemeat intended for human consumption. *See id.*; *see also Empacadora de Carnes de Fresnillo*, 476 F.3d at 335 n.7 (noting that the only American producer of horsemeat for human consumption outside of Texas operated in Illinois). The Illinois statute was challenged by Cavel International, a subsidiary of a Belgian company, whose entire output of horsemeat was exported to Belgium, France, and Japan. *Cavel Int'l, Inc.*, 500 F.3d at 552–53; *see also id.* at 552 (noting that Americans no longer eat horsemeat). The Seventh Circuit Court of Appeals determined that the Illinois statute was not preempted by the Federal Meat Inspection Act and did not violate the dormant Commerce Clause. *See id.* at 554–57.

It has been reported that with the closure of the horse slaughter operations in the United States, the horsemeat industry has turned to Mexico and Canada where horses taken from Texas and New Mexico are slaughtered for their meat for export abroad. *See* Suzanne Gamboa, *Horses on way to slaughter staying in tax-funded pens*, San Antonio Express-News, Oct. 4, 2007; Suzanne Gamboa,

---

[4]Beltex owned a controlling interest in Empacadora de Carnes de Fresnillo. *See Empacadora de Carnes de Fresnillo v. Curry*, 476 F.3d 326, 329 (5th Cir.) (reciting factual background to litigation), *cert. denied*, 127 S. Ct. 243 (2007).

*State helping get horses to slaughter in Mexico*, The Austin American-Statesman, Oct. 3, 2007.[5] The meat is primarily exported to Japan, Italy, Belgium and France. *2005–2006 Legislative Review*, 12 ANIMAL L. 277, 280 n.16 (2006). With this background, we turn to the factual backdrop you provide for your question. *See* Request Letter, *supra* note 3, at 1–2.

## II.     Factual Backdrop

You inform us that "foreign corporations" operate horse slaughterhouses that process horsemeat for human consumption. *Id.* at 1. This horsemeat is sold only in foreign nations, particularly in Europe. *Id.* The horsemeat, you inform us, travels through the United States "'in-bond,' meaning that the product is merely passing through [United States] territory prior to immediate export, and thus, no custom, duties, or import taxes are assessed upon it." *Id.* (citing 19 U.S.C. § 1553 (2000) and 19 C.F.R. § 18.10 (2007)). You suggest that in-bond transportation of horsemeat through Texas is governed by federal law—section 1553 of the Tariff Act of 1930, 19 U.S.C § 1553, and the regulations promulgated thereunder and codified at 19 C.F.R. § 18.21. *Id.* at 2.

The information we are provided is limited. You do not indicate how or why the horsemeat is "transported" through Texas or its ultimate destination in Texas from which it is exported abroad. You also do not identify any particular corporations or otherwise elaborate on the foreign corporations about which you ask. The term "foreign corporation" under Texas law may be used to describe a corporation formed under a jurisdiction other than Texas. *See, e.g.*, TEX. BUS. ORGS. CODE ANN. § 21.002(7) (Vernon 2007); TEX. BUS. CORP. ACT ANN. art. 1.02(A)(14) (Vernon Supp. 2007) (defining "foreign corporation"). However, based on (i) the use of the term in the context of your letter, (ii) the Fifth Circuit Court of Appeals' statement in *Empacadora de Carnes de Fresnillo* that it was not addressing the "application of Chapter 149 to an entity that merely transports horsemeat through Texas but engages in no other commercial activity within the State, as Empacadora [owned by Beltex, but operating in Mexico] speculates it may do one day," *Empacadora de Carnes de Fresnillo*, 476 F.3d at 335,[6] and (iii) reports indicating that after the closure of the Texas and Illinois slaughterhouses, horses are slaughtered for their meat in Canada and Mexico, we understand you to refer more loosely to a corporation that is formed under a jurisdiction other than the United States and that slaughters horses at a location outside the United States.

## III.     Statutory Preemption

You ask whether section 1553 of the Tariff Act of 1930 and the federal regulations promulgated thereunder govern the in-bond transport of horsemeat through Texas by foreign

---

[5]*See also* Letter Brief from Rebecca G. Judd, Esq., The Humane Society of the United States, to Honorable Greg Abbott, at 2 (Nov. 6, 2007) ("Each year, tens of thousands of American horses are exported from the United States to Mexico to be slaughtered for human consumption in Europe and Asia."); Amicus Curiae Brief of Anuj A. Shah, Texas Citizen, at 3–4 (received Nov. 5, 2007) ("Because the slaughterhouses [in the United States] have been shut down, the horses that were once slaughtered in Texas are being shipped to Mexico.").

[6]*See also infra* note 8.

corporations for sale abroad. *See* Request Letter, *supra* note 3, at 1–2. Section 1553 provides in relevant part:

> Any merchandise, other than explosives and merchandise the importation of which is prohibited, shown by . . . document to be destined to a foreign country, may be entered for transportation in bond through the United States by a bonded carrier without appraisement or the payment of duties and exported under such regulations as the Secretary of the Treasury shall prescribe . . . .

19 U.S.C. § 1553(a) (2000); *see also id.* § 1553(b) (stating that regulations "shall not permit the transportation of lottery materials in the personal baggage of a traveler"). Citing to 19 C.F.R. § 18.21(b), you state that the only products specifically prohibited by federal regulation in addition to explosives and some lottery tickets, are illegal narcotics. Request Letter, *supra* note 3, at 2. Section 18.21(b) provides:

> Narcotics and other articles prohibited admission into the commerce of the United States shall not be entered for transportation and exportation . . . , except that exportation or transportation and exportation may be permitted upon written authority from the proper governmental agency and/or compliance with the regulations of such agency.

19 C.F.R. § 18.21(b) (2007); *see also id.* § 18.21(d) (prohibiting entry of explosives unless the importer has obtained a license or permit from the proper governmental agency). Finally, you note that "[h]orsemeat is not precluded from in-bond transportation through the [United States]." Request Letter, *supra* note 3, at 2.

Based on your question and statements summarized above, we understand you to suggest that section 1553 and the cited regulations promulgated thereunder may preempt chapter 149 of the Texas Agriculture Code. As indicated earlier, the Fifth Circuit Court of Appeals in *Empacadora de Carnes de Fresnillo* in its statutory preemption analysis addressed only the Federal Meat Inspection Act and held that it did not preempt chapter 149. *See Empacadora de Carnes de Fresnillo*, 476 F.3d at 333–36. Here, we consider only section 1553 and the federal regulations you specifically raise.[7] However, because we have been provided with limited information and no legal arguments specifying how or why the federal law preempts chapter 149, our analysis is necessarily general and necessarily speculative to the extent it is premised on certain factual and legal assumptions regarding what those arguments would be.

---

[7]Your question necessarily assumes that sections 149.002 and 149.003 by their literal terms apply to the transport of the horsemeat through Texas for export abroad for human consumption; thus, we also assume such application and consider only the federal challenge you raise.

### A.    Legal presence

Before proceeding with the general statutory preemption analysis, we consider your statement that goods transported in-bond, including horsemeat, through Texas or other states are "deemed not to be present—and thus are not taxed or dutied." Request Letter, *supra* note 3, at 1–2. We understand you to suggest that based on the federal law, horsemeat transported in-bond through Texas is not legally present for the purposes of chapter 149. You cite no authority, and we have found none to support the general proposition that goods transported in-bond through the states are not legally present there. *See, e.g., United States v. Watches, Watch Parts, Calculators & Misc. Parts*, 692 F. Supp. 1317, 1322 (S.D. Fla. 1988) ("The merchandise, though in-bond, was imported and admitted for entry for purposes of applying the Trademark Act of 1946, 15 U.S.C. § 1124."). Neither section 1553 nor the federal regulations you cite make such a statement. 19 U.S.C. § 1553 (2000); 19 C.F.R. §§ 18.1, .10–.11, .20–.21 (2007). But even assuming that such a proposition could be derived from section 1553 and the related regulations, in the context of the federal law, goods transported in-bond would *not be legally present* in a state for the purposes of imposing fees, duties, or taxes as your statement appears to acknowledge. *See* Request Letter, *supra* note 3, at 1–2 (stating that goods transported in-bond are "deemed not to be present—and thus are not taxed or dutied").

### B.    General statutory preemption principles

We begin our statutory preemption analysis by reviewing its underlying basis and fundamental principles. Under the Supremacy Clause of the United States Constitution, Congress has the power to preempt state law. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). When addressing preemption claims, a court's "'sole task is to ascertain the intent of Congress.'" *Empacadora de Carnes de Fresnillo*, 476 F.3d at 333 (quoting *Cal. Fed. Sav. & Loan v. Guerra*, 479 U.S. 272, 280 (1987)). Preemption is not "lightly presumed." *Id.* Federal law can expressly preempt state law. *Id.* But even if the federal law does not expressly preempt state law, "it may do so implicitly by directly conflicting with [state law] or by occupying a field so pervasively as to naturally exclude [state law]." *Id.* (citing *Perry v. Mercedes Benz of N. Am., Inc.*, 957 F.2d 1257, 1261 (5th Cir. 1992)); *see also Crosby*, 530 U.S. at 373 n.6 ("We recognize, of course, that the categories of preemption are not 'rigidly distinct.'").

### C.    Section 1553

In order to determine congressional intent by applying these statutory preemption doctrines, it is necessary to consider and understand the express provisions of the federal law at issue here. Under section 1553 of the Tariff Act, any merchandise—other than explosives and those whose importation is prohibited—destined for a foreign country may be entered and transported through the United States "in bond" without the appraisement or payment of duties and then exported. *See* 19 U.S.C. § 1553(a) (2000). The related federal regulations detail the requirements and procedures applicable to the transport of such merchandise. *See, e.g.*, 19 C.F.R. §§ 18.1, .10–.11, .20–.21 (2007). Section 18.10, for instance, provides for the different types of "entries and withdrawals," including "[e]ntry for immediate transportation without appraisement" and "[e]ntry for exportation." *Id.* § 18.10(1), (5). Section 18.11 provides how such entries must be made for particular types of

merchandise. *Id.* § 18.11. And section 18.21 prohibits the entry for transportation and exportation of "[n]arcotics and other articles prohibited admission into the commerce of the United States" unless permitted by the "proper governmental agency" and of explosives unless the importer obtains "a license or permit from the proper governmental agency." *Id.* § 18.21(b), (d). With this general overview of the federal law, we consider whether it expressly or impliedly preempts state law with respect to the transport of horsemeat in-bond for immediate export abroad.

**D.    Express preemption**

Section 1553 does not expressly preempt state law regulating the transportation of horsemeat through a state for export abroad. It does not contain an express preemption clause. *See* 19 U.S.C. § 1553 (2000). Nor do the federal regulations thereunder contain such an express preemption clause. *See* 19 C.F.R. §§ 18.1, .10–.11, .20–.21 (2007); *see also Hillsborough County v. Automated Med. Lab., Inc.*, 471 U.S. 707, 713 (1985) ("We have held repeatedly that state laws can be pre-empted by federal regulations as well as by federal statutes.").

**E.    Implied preemption**

But as stated above, even if the federal law does not expressly preempt state law, it may do so implicitly by occupying a field so pervasively as to naturally exclude state regulation or by directly conflicting with the state law. *Empacadora de Carnes de Fresnillo*, 476 F.3d at 333–34; *see also Crosby*, 530 U.S. at 372 ("And even if Congress has not occupied the field, state law is naturally preempted to the extent of any conflict with a federal statute.").

**1.    Field occupation**

We first consider whether the cited federal statute and the regulations occupy the field. "Field preemption requires a clear congressional intent" and "occurs when a federal statute's scope 'indicates that Congress intended federal law to occupy a field exclusively.'" *Empacadora de Carnes de Fresnillo*, 476 F.3d at 334 (quoting *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995)).

You do not specify or suggest the "field" preempted here. To proceed with the preemption analysis, however, it is necessary to posit a "field." Based on the statements made in the request letter, we assume, for the purposes of this opinion, that the broadest field would be the field of goods or merchandise that may be transported through the states in-bond, including horsemeat. Section 1553 and the related federal regulations do not indicate a clear congressional intent to occupy this field.

First, section 1553 is part of the Tariff Act of 1930. *See* Tariff Act of 1930, 46 Stat. 590 (current version at 19 U.S.C. ch. 4 (Tariff Act of 1930), subtit. III (Administrative Provisions), pt. IV (Transportation in Bond and Warehousing of Merchandise) (2000)). The Tariff Act deals specifically with the *appraisement or imposition of custom duties* on merchandise brought into the United States. *See id.* Section 1553 precludes only the appraisement or imposition of duties on

bonded goods brought into the United States solely for export. *Id.* § 1553; *Portland Pipe Line Corp. v. Envtl. Improvement Comm'n*, 307 A.2d 1, 34 n.55 (Me. 1973). And the related federal regulations detail how the merchandise must be documented, stored, and transported, and they restrict or prohibit the entry of certain merchandise. *See* 19 C.F.R. pt. 18 (2007) (Transportation in Bond and Merchandise in Transit). The congressional objective in enacting the Tariff Act was to "encourage merchants here and abroad to make use of American ports" by "waiv[ing] all duty on goods that were reexported . . . and defer[ring], for a prescribed period, the duty on goods destined for American consumption." *Xerox Corp. v. County of Harris*, 459 U.S. 145, 150–51 (1982). The United States Supreme Court has stated that this objective "would be frustrated by the imposition of state sales and property taxes on goods not destined for domestic distribution." *Itel Containers Int'l Corp. v. Huddleston*, 507 U.S. 60, 70 (1993) (citing *Xerox Corp.*, 459 U.S. at 150–54, *R.J. Reynolds Tobacco Co. v. Durham County*, 479 U.S. 130, 144–47 (1986), *McGoldrick v. Gulf Oil Corp.*, 309 U.S. 414, 428–29 (1940)). Chapter 149, however, does not impose any taxes or fees; it prohibits the transport and sale of a particular merchandise—horsemeat for human consumption—through Texas.

Second, even assuming that the scope of section 1553 is broader than the exemption of bonded goods in transit from the appraisement and imposition of fees and taxes, the statute is not mandatory with regard to the merchandise entered and transported through the United States. *See* 19 U.S.C. § 1553(a) (2000) ("Any merchandise, other than explosives *and merchandise the importation of which is prohibited* . . . destined to a foreign country, *may* be entered for transportation in bond through the United States . . . and exported under such regulations as the Secretary of the Treasury shall prescribe . . . .") (emphasis added). And it expressly recognizes that certain merchandise may be prohibited entry and transportation. *See id.* The statute does not expressly or impliedly require that all merchandise destined for a foreign country, other than those expressly prohibited by federal law, be permitted to enter for transportation in-bond through the United States. *See id.* Nor do the federal regulations cited require that all merchandise other than those prohibited by the regulations be allowed entry and transportation. *See* 19 C.F.R. § 18.21 (2007).

## 2. Direct conflict or obstacles

Section 1553 and the related federal regulations also do not preempt chapter 149 by conflict. Conflict preemption is found where (i) it is "'physically impossible' for a private party to comply with both federal and state law," or (ii) the state law "stand[s] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Empacadora de Carnes de Fresnillo*, 476 F.3d at 334 (quoting *Planned Parenthood of Houston & Se. Tex. v. Sanchez*, 403 F.3d 324, 336 (5th Cir. 2005)). It is not physically impossible to comply with section 1553 and the related federal regulations on the one hand and chapter 149 on the other. Complying with chapter 149 by not transporting horsemeat through Texas does not violate any provision of the federal law. And chapter 149 does not stand as an obstacle to realizing the Tariff Act's objective of encouraging the use of United States ports by a policy of waiving custom duties on exported goods. *See Itel Containers Int'l Corp.*, 507 U.S. at 69–70 (discussing the Supreme Court's construction of the Tariff Act's objective); *see also Crosby*, 530 U.S. at 373 ("What is a sufficient obstacle is a matter of

judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects."). Again, chapter 149 does not impose any taxes or duties; it has no implications for the federal policy of exempting export goods from custom duties.

If there is a preemption argument here, it would appear to be that application of chapter 149's transportation ban is an obstacle to section 1553 because the state law prohibits what the federal law "allows" by equating failure of the federal law to prohibit entry and transportation of horsemeat with direction to the states to permit it. *See* Request Letter, *supra* note 3, at 2 ("Horsemeat is not precluded from in-bond transportation through the [United States]."). No court has so construed or applied section 1553. *See Jones v. Rath Packing Co.*, 430 U.S. 519, 526 (1977) (stating that obstacle preemption inquiry requires a consideration of the "relationship between state and federal laws as they are *interpreted and applied* not merely as they are written") (emphasis added). The federal law neither prohibits the transport of horsemeat through any state nor requires the states to permit such transport. The state law simply prohibits what the federal law does not prohibit. *Bronco Wine Co. v. Jolly*, 95 P.3d 422, 454 (Cal. 2004). This arrangement does not pose an obstacle to the federal policy embodied in the Tariff Act. *Cf. Viva! Int'l Voice for Animals v. Adidas Promotional Retail Operations*, 162 P.3d 569, 583 (Cal. 2007) (stating that "federal law does not prohibit importation of kangaroo products, while state law does" and concluding that the "arrangement poses no obstacle to current federal policy").

Based on a review of the federal law, we believe a court would likely find that section 1553 and the federal regulations promulgated thereunder do not expressly or impliedly preempt the application of chapter 149 to a foreign corporation that transports horsemeat for human consumption in-bond through Texas for immediate export abroad.

## IV.    Dormant Commerce Clause

The application of chapter 149 to a foreign company that transports horsemeat in-bond through Texas for export abroad also implicates foreign commerce, which the Fifth Circuit Court of Appeals in *Empacadora de Carnes de Fresnillo* specifically raised as an issue, but did not address. *See Empacadora de Carnes de Fresnillo*, 476 F.3d at 335.[8] In order to fully address your question, we discuss the application of the dormant Commerce Clause in this context. Again, our

---

[8]The court specifically noted with respect to the dormant Commerce Clause discussion:

> We do not address the potential application of Chapter 149 to an entity that merely transports horsemeat through Texas but engages in no other commercial activity within the State, as Empacadora speculates that it may do one day. That hypothetical situation is not before us. While prosecuting such a company would raise unique dormant Commerce Clause concerns—specifically with regard to the Foreign Commerce Clause—none of the slaughterhouses fit that description, nor does there appear to be any company that merely transports horsemeat through Texas.

*Empacadora de Carnes de Fresnillo*, 476 F.3d at 335 (footnote omitted).

discussion is necessarily general and necessarily speculative given the general nature of your question and factual backdrop.

## A. General Commerce Clause principles

The United States Constitution's Commerce Clause empowers Congress to "regulate Commerce with foreign Nations, and among the several States." U.S. CONST. art. I, § 8, cl. 3. Although this provision does not by its terms limit the powers of states to regulate commerce, it has been interpreted to contain a negative or dormant aspect that limits the states' powers to regulate commerce even in the absence of a conflicting federal statute. *United Haulers Assoc., Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 127 S. Ct. 1786, 1792–93 (2007). The dormant aspect of the Commerce Clause applies to both the Foreign Commerce Clause ("Commerce with foreign Nations") and to the Interstate Commerce Clause ("Commerce . . . among the several States"). *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 749 (5th Cir. 2006) (citing Supreme Court's dormant Commerce Clause cases).

State laws violate the dormant Commerce Clause by discriminating against or unduly burdening foreign or interstate commerce. *Id.* at 750 (citing *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 98 (1994) (Interstate Commerce Clause) and *Kraft Gen. Foods, Inc. v. Iowa Dep't of Revenue and Fin.*, 505 U.S. 71, 81 (1992) (Foreign Commerce Clause)). Laws that "facially discriminate are virtually per se invalid." *Id.* (citing *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 575 (1997), *Kraft Gen. Foods, Inc.*, 505 U.S. at 81, and *Nat'l Solid Waste Mgmt. Ass'n v. Pine Belt Reg'l Solid Waste*, 389 F.3d 491, 497 (5th Cir. 2004)). In contrast, "evenhanded" laws that only incidentally burden commerce are valid "unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). In the context of the Foreign Commerce Clause, state laws are subject to additional scrutiny: Nondiscriminatory state laws affecting foreign commerce are invalid "'if they (1) create a substantial risk of conflicts with foreign governments; or (2) undermine the ability of the federal government to 'speak with one voice' in regulating commercial affairs with foreign states.'" *Piazza's Seafood World, LLC*, 448 F.3d at 750 (quoting *New Orleans S.S. Ass'n v. Plaquemines Port Harbor & Terminal Dist.*, 874 F.2d 1018, 1022 (5th Cir. 1989)).

## B. Facial discrimination

Chapter 149 does not facially discriminate against interstate or foreign commerce. *See* TEX. AGRIC. CODE ANN. §§ 149.002–.003 (Vernon 2005). "In this context, discrimination 'simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'" *Nat'l Solid Waste Mgmt. Ass'n*, 389 F.3d at 499 (quoting *Or. Waste Sys., Inc.*, 511 U.S. at 99). Chapter 149 prohibits any person—whether foreign or local—from possessing and transporting horsemeat intended for sale as food for human consumption irrespective of the origin or destination of the horsemeat. *See* TEX. AGRIC. CODE ANN. §§ 149.002–.003 (Vernon 2004). First, as the Fifth Circuit Court of Appeals stated, chapter 149 "treats both intrastate and interstate trade of horsemeat equally by way of a blanket prohibition," does not evidence "economic protectionism," and "does not favor in-state actors over out-of-state actors." *Empacadora de Carnes de Fresnillo*,

476 F.3d at 335; *see also City of Philadelphia v. New Jersey*, 437 U.S. 617, 623–24 (1978) (stating that the guiding principle in determining whether a state regulation discriminates against interstate or foreign commerce is whether the purpose or the effect of the regulation is economic protectionism).

Second, the fact that the statute's blanket prohibition also bans the transport of horsemeat intended as food for human consumption through Texas for export abroad does not make it facially discriminatory. In *Pacific Northwest Venison Producers v. Smitch*, the Ninth Circuit Court of Appeals upheld a state regulation prohibiting the importation, possession, propagation, transfer, or release of listed "deleterious exotic wildlife" against a Commerce Clause challenge. *See Pac. Nw. Venison Producers v. Smitch*, 20 F.3d 1008, 1010–17 (9th Cir. 1994). The Ninth Circuit Court of Appeals rejected the argument that a state prohibition of imports or exports is per se discriminatory, stating that "[a]n import ban that simply effectuates a complete ban on commerce in certain items is not discriminatory, as long as the ban on commerce does not make distinctions based on the origin of the items. *Id.* at 1012. In short, chapter 149 does not facially discriminate because "[n]o local merchant or producer benefits from the ban," *Cavel Int'l, Inc.*, 500 F.2d at 555; and it "does not make distinctions based on the origin" of the horsemeat, *Pac. Nw. Venison Producers*, 20 F.3d at 1012.

It could be argued, however, that chapter 149 facially discriminates against foreign commerce because the practical effect of the transportation ban currently falls only on foreign corporations—only foreign corporations now slaughter horses for human consumption. *See supra* pp. 3–4; *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 500 (5th Cir. 2001) (stating that a facially neutral statute may still be discriminatory because of its effect (citing *Minn. v. Clover Leaf Creamery Co.*, 449 U.S. 456, 471 n.15 (1981))). But the fact that a law affects primarily out-of-state corporations, "does not tend to prove that a statute is discriminatory." *Int'l Truck & Engine Corp. v. Bray*, 372 F.3d 717, 726 (5th Cir. 2004) (citing *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 126 (1978), *Ford Motor Co.*, 264 F.3d at 502). "Absent a facially discriminatory purpose, a State statute or regulation is discriminatory when it provides for differential treatment of similarly situated entities based upon their contacts with the State or has the effect of providing a competitive advantage to in-state interests vis-a-vis similarly situated out-of-state interests." *Ford Motor Co.*, 264 F.3d at 501. Chapter 149's transportation ban neither discriminates based on a person's contacts with Texas nor provides a competitive advantage to in-state persons.

## C.    Incidental burden

An evenhanded statute—one that does not facially discriminate against out-of-state commerce and only incidentally affects interstate or foreign commerce—will be upheld unless the burden it imposes is "clearly excessive in relation to the putative local benefits" of the statute. *Nat'l Solid Waste Mgmt. Ass'n*, 389 F.3d at 498, 501 (quoting *Pike*, 397 U.S. at 142). This is referred to as the "*Pike* balancing test." *See id.* Under this test,

> if a legitimate local purpose is found, then the question becomes one
> of degree. And the extent of the burden that will be tolerated will of

course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Pike*, 397 U.S. at 142.

In applying the *Pike* test, a court "first look[s] for a legitimate public purpose" advanced by the state statute. *Nat'l Solid Waste Mgmt. Ass'n*, 389 F.3d at 502. Chapter 149's prohibition against the sale, possession, and transfer of horsemeat through Texas advances legitimate local interests: preserving horses, preventing the consumption of horsemeat, and preventing horse theft. *See Empacadora de Carnes de Fresnillo*, 476 F.3d at 336 (reciting proffered interests advanced by chapter 149); *see also Cavel Int'l, Inc.*, 500 F.3d at 557 ("States have a legitimate interest in prolonging the lives of animals that their population happens to like."); *id.* ("[States] can ban bullfights and cockfights and the abuse and neglect of animals."). And these are legitimate interests with respect to horses found or slaughtered outside of Texas. *Cf. Viva! Int'l Voice for Animals*, 162 P.3d at 573 ("state may constitutionally conserve wildlife elsewhere by refusing to accept local complicity in its destruction"); *Ill. Rest. Ass'n v. City of Chicago*, 492 F. Supp. 2d 891, 895 (N.D. Ill. 2007) (upholding ordinance banning the sale of foie gras, produced elsewhere, in city restaurants reflecting local judgment that it would "advance the morals of the community"). The statutory ban on transporting horsemeat through Texas—irrespective of its origin and ultimate destination—advances the state's interest in preserving horses and preventing their consumption and theft. *See Empacadora de Carnes de Fresnillo*, 476 F.3d at 336. The Fifth Circuit Court in *Empacadora de Carnes de Fresnillo* did not discount that "removing the significant monetary incentives in the global horsemeat market" increases the preservation of horses and decreases the consumption of horsemeat and theft of horses. *See Empacadora de Carnes de Fresnillo*, 476 F.3d at 336.[9]

Finding a legitimate public purpose, a court will then identify the burden imposed on interstate or foreign commerce. *Nat'l Solid Waste Mgmt. Ass'n*, 389 F.3d at 502. To successfully challenge a state regulation, "the challenging party must show that the regulation has 'a disparate impact on interstate commerce.'" *Id.* (quoting *Automated Salvage Transp., Inc. v. Wheelabrator*

---

[9]As the Seventh Circuit Court of Appeals explained:

> Cavel [International] pays for horses; rendering plants [that produce pet food from carcasses of dead horses rather than by the slaughter of horses] do not. If your horse dies, or if you have it euthanized, you must pay to have it hauled to the rendering plant, and you must also pay to have it euthanized if it didn't just die on you. So when your horse is no longer useful to you, you have a choice between selling it for slaughter and either keeping it until it dies or having it killed. The option of selling the animal for slaughter is thus financially more advantageous to the owner, and this makes it likely that many horses (remember that Cavel slaughters between 40,000 and 60,000 a year) die sooner than they otherwise would because they can be killed for their meat.

*Cavel Int'l, Inc.*, 500 F.3d at 556–57.

*Envtl. Sys., Inc.*, 155 F.3d 59, 75 (2d Cir. 1998)); *see also Empacadora de Carnes de Fresnillo*, 476 F.3d at 336 (stating that "incidental" burdens to which *Pike* refers to are the burdens on interstate commerce that exceed the burdens on intrastate commerce). If the state regulation does not have a disparate impact, the court "'must conclude that [the state regulations] have not imposed any incidental burdens on interstate commerce' and therefore, that it passes the *Pike* test." *Nat'l Solid Waste Mgmt. Ass'n*, 389 F.3d at 502 (quoting *Automated Salvage Transp., Inc.*, 155 F.3d at 75).

The Fifth Circuit Court of Appeals in *Empacadora de Carnes de Fresnillo* stated that chapter 149 does not place any burden "on interstate commerce that does not equally befall intrastate commerce." *Empacadora de Carnes de Fresnillo*, 476 F.3d at 336. Similarly, chapter 149's transportation ban does not place any burden on the domestic or foreign horsemeat trade that it does not equally place on in-state trade. Thus, we believe the state transportation ban would pass the *Pike* test.

But even assuming that chapter 149's transportation ban burdens interstate or foreign commerce, a party challenging the state law has the heavy burden of establishing that the incidental burdens on interstate and foreign commerce are clearly excessive in relation to the putative local benefits. *See Cavel Int'l, Inc.*, 500 F.3d at 555; *Int'l Truck & Engine*, 372 F.3d at 728; *Ford Motor Co.*, 264 F.3d at 503–04; *Pac. Nw. Venison Producers*, 20 F.3d at 1014. "Evidence that interstate and foreign commerce is in some way affected . . . is not enough to meet [this] burden." *Pac. Nw. Venison Producers*, 20 F.3d at 1015.

It seems unlikely that a challenging party could meet this heavy legal burden and establish that the impact is "clearly excessive" in relation to the "putative local benefit." *Cf. United Haulers Assoc.*, 127 S. Ct. at 1797 (stating that the Court need not decide whether the city "ordinances impose any incidental burden . . . because any arguable burden does not exceed the public benefits of the ordinances"); *Int'l Truck & Engine*, 372 F.3d at 728 (stating that even assuming that the state statute burdens interstate commerce, "that burden would not be clearly excessive as compared to the putative local benefits"); *Ford Motor Co.*, 264 F.3d at 503 (stating that even assuming the state statute burdens interstate commerce, "Ford has failed to establish that the burden is clearly excessive in relation to the putative local benefits").[10] The fact that the statutory ban may simply *affect* particular foreign slaughterhouses—most likely slaughterhouses located in Mexico, which is the only foreign nation that shares a border with Texas—would not establish that the statute's impact on the foreign horsemeat trade is "clearly excessive" in relation to Texas's legitimate "putative local interest" in preserving horses and limiting horse consumption and theft. *Cf. Pac. Nw. Venison Producers*, 20 F.3d at 1015 (stating that evidence that interstate and foreign commerce is in some way affected by the state law is insufficient to meet plaintiff's burden in showing violation of Commerce Clause).

---

[10]In this regard, the Fifth Circuit Court of Appeals has stated that in assessing a statute's putative local benefits the court will not "'second guess the empirical judgment of lawmakers concerning the utility of legislation.'" *Int'l Truck & Engine*, 372 F.3d at 728; *Ford Motor Co.*, 264 F.3d at 503 (quoting *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 92 (1987)). The court will credit a putative local benefit so long as the regulation is not "wholly irrational in light of its purposes." *Int'l Truck & Engine*, 372 F.3d at 728; *Ford Motor Co.*, 264 F.3d at 503.

### D.    Foreign commerce

When state regulations affect foreign commerce, additional scrutiny is necessary to determine whether they interfere with the federal government's ability to speak with a single voice when regulating commerce with foreign countries, *see Japan Line, Ltd. v. Los Angeles County*, 441 U.S. 434, 451 (1979); or implicate "matters of concern to the entire Nation . . . such as the potential for international retaliation." *Kraft General Foods, Inc.*, 505 U.S. at 79. (1992). The United States Supreme Court has explained that the dormant Foreign Commerce Clause precludes a state from preferring "domestic commerce over foreign commerce even if the State's own economy is not a direct beneficiary of the discrimination." *Id.*

First, chapter 149 treats the transportation of foreign and domestic horsemeat equally. Thus, the dormant Foreign Commerce Clause is arguably inapplicable. *Cf. Ill. Rest. Ass'n*, 492 F. Supp. 2d at 905 ("Because the Ordinance treats domestic and foreign foie gras equally . . . the dormant Foreign Commerce Clause is inapplicable.").

Second, there is no indication that the transportation of horsemeat for sale and export abroad is a matter in which national uniformity is important. At least two other states—California and Illinois—have laws similar to the Texas law. *See* CAL. PENAL CODE § 598c (West 1999); 225 ILL. COMP. STAT. ANN. 635/1.5 (West 2007). There is no indication that these differing state regulations create any particular difficulties for foreign producers of horsemeat or for the federal government in its relations with foreign governments. Thus, again, the Foreign Commerce Clause scrutiny is arguably inapplicable here. *Cf. Pac. Nw. Venison Producers*, 20 F.3d at 1013–14 (determining that the higher scrutiny under the Foreign Commerce Clause was unnecessary in the absence of evidence that importation of wildlife regulated by state law was a matter in which national uniformity was important or that international commerce in such animals might be of concern to the whole nation).

Third, even assuming the additional scrutiny applies here, there is no indication that chapter 149's ban on transporting horsemeat through Texas has any significant impact on foreign horsemeat trade or creates the potential for foreign retaliation. In *Cavel International, Inc.*, the Seventh Circuit Court of Appeals rejected the contention that the substantially similar Illinois statute prohibiting the slaughter of horses for human consumption burdened foreign commerce in the absence of any evidence regarding the percentage of horsemeat supplied by the corporation and the effect its closure would have on the price of horsemeat in Europe:

> Suppose Cavel were the only source of horse meat for human consumption in Europe and the law provoked European governments into remonstrating with our State Department, which in response submitted to us an amicus curiae brief denouncing the law. . . .

> But assuming therefore that the doctrine of *Japan Line* survives the *Barclays Bank* case [where the Supreme Court rejected a Foreign Commerce Clause challenge even though many foreign nations complained about a state law increasing foreign companies'

cost of filing United States tax returns], this cannot help Cavel, which did not tell the district court and has not told us what percentage of the horse meat consumed by Europeans it supplies and thus whether its being closed down is likely to have a big effect on the price of horse meat in Europe.

*Cavel Int'l, Inc.*, 500 F.3d at 558.   The Seventh Circuit Court of Appeals concluded that the "curtailment of foreign commerce by the amendment is slight and we are naturally reluctant to condemn a state law, supported if somewhat tenuously by a legitimate state interest, on grounds as slight as presented by Cavel." *Id.* 558.

Thus, unless the foreign corporations affected by the Texas ban are the sole or a substantial source of horsemeat produced for human consumption in Europe and Asia; *and* their inability to transport horsemeat through Texas affects the availability and price of horsemeat in those markets sufficient to provoke European and Asian countries to complain about the Texas law, it is unlikely that a court would conclude that the Texas ban violates the Foreign Commerce Clause.

In sum, based on present judicial precedent, we believe a court would likely find that the application of chapter 149 to a foreign corporation that transports horsemeat intended for sale as food for human consumption in-bond through Texas for immediate export abroad does not violate the federal dormant Commerce Clause by discriminating against or unduly burdening interstate or foreign commerce.

### S U M M A R Y

Chapter 149 of the Agriculture Code makes it an offense for any person to sell horsemeat for human consumption, possess horsemeat with the intent to sell it as food for human consumption, or transfer horsemeat to a person who intends to sell it for human consumption irrespective of the origin or destination of the horsemeat. A court would likely find that section 1553 of the Tariff Act of 1930 and federal regulations promulgated thereunder do not preempt the application of chapter 149 to a foreign corporation that transports horsemeat intended for sale as food for human consumption in-bond through Texas for immediate export abroad. Similarly, a court would likely find that the application of chapter 149 to a foreign corporation that transports such horsemeat in-bond through Texas for immediate export abroad does not violate the federal dormant Commerce Clause by discriminating against or unduly burdening interstate or foreign commerce.

Very truly yours,

GREG ABBOTT
Attorney General of Texas

KENT C. SULLIVAN
First Assistant Attorney General

ANDREW WEBER
Deputy Attorney General for Legal Counsel

NANCY S. FULLER
Chair, Opinion Committee

Sheela Rai
Assistant Attorney General, Opinion Committee