Filed 11/30/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| MAXINE BEASLEY et al.,<br><br>    Plaintiffs and Appellants,<br><br>v.<br><br>TOOTSIE ROLL INDUSTRIES, INC.,<br><br>    Defendant and Respondent. | A164199<br><br>(Alameda County Super. Ct.<br>No. RG21086723) |

In this putative class action, plaintiff Maxine Beasley sued defendant Tootsie Roll Industries, Inc. (Tootsie Roll), alleging violations of federal and state law arising from the use of partially hydrogenated oils (PHOs) in Tootsie Roll's products between 2010 and 2016. In her operative first amended complaint (FAC), Beasley asserted the use of PHOs was unlawful and unfair under the Unfair Competition Law (UCL) (Bus. & Prof. Code, § 17200 et seq.) and breached the implied warranty of merchantability.

The trial court sustained Tootsie Roll's demurrer to the FAC without leave to amend, concluding (1) Beasley failed to allege cognizable injury, (2) her claims were barred by statutes of limitations, and (3) her claims were preempted by federal law (specifically a congressional enactment providing the use of PHOs is not to be deemed violative of food additive standards until June 18, 2018). Beasley appeals, and the parties have joined issue on the grounds for demurrer reached by the trial court—preemption, injury, and the statutes of limitations—as well as the question whether the FAC states a

1

claim for violation of the UCL or breach of the implied warranty of merchantability.

We conclude the FAC does not state a claim under the UCL and that portions of that claim are preempted by federal law. We also conclude the claim for breach of warranty is preempted. We therefore affirm the trial court's judgment in favor of Tootsie Roll.[1]

## I. BACKGROUND

### A. *The Allegations in the FAC*

Since we are reviewing a judgment entered after the trial court sustained Tootsie Roll's demurrer, we assume the truth of all properly pleaded material allegations in the FAC " 'in evaluating the validity' of the decision below." (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 635.)

Beasley alleged in the FAC that, during the proposed class period—January 1, 2010 through December 31, 2016—Tootsie Roll manufactured, distributed, and sold products (Tootsie Rolls and Tootsie Pops) that contained artificial trans fats in the form of PHOs. The FAC alleged trans fats are harmful and cause cardiovascular disease, type 2 diabetes, cancer, Alzheimer's disease, and organ damage.

Beasley alleged she purchased Tootsie Roll products containing PHOs during the class period. She sought to represent a class defined as: "All citizens of California who purchased Tootsie Products containing partially hydrogenated oil in California between January 1, 2010 and December 31, 2016."

---

[1] Because we affirm the judgment on the grounds discussed in the text, we need not address whether affirmance would also be appropriate on the other grounds briefed by the parties (i.e., whether Beasley alleged a cognizable injury and whether her claims are barred by the statutes of limitations).

As to injury, Beasley alleged she had suffered physical injury in the form of harm to her cells and her cardiovascular and other systems. She also alleged her consumption of Tootsie Roll's products placed her at increased risk of disease and death. Finally, Beasley alleged she sustained economic injury in the amount she paid for Tootsie Roll's products, which she stated "were not fit for human consumption, and had a value of $0 or less." She would not have purchased the products "if she had known of [Tootsie Roll's] conduct." Beasley also stated her economic injury included "medical monitoring costs," but she did not include any details about such costs.

Beasley asserted claims for violation of the UCL (first cause of action) and breach of the implied warranty of merchantability (second cause of action). In her UCL claim, Beasley alleged Tootsie Roll's use of PHOs was both "unfair" and "unlawful" within the meaning of that statute. As to unfairness, Beasley alleged in part that the harmful health effects of PHOs outweigh any utility they may have, and that their use violated public policy as reflected in federal and state statutes. As to the unlawful prong of the UCL, Beasley alleged Tootsie Roll's use of PHOs violated the Federal Food, Drug, and Cosmetic Act (FDCA or federal FDCA) (21 U.S.C. § 301 et seq.) and California's Sherman Food, Drug, and Cosmetic Law (Health & Saf. Code, § 109875 et seq.) (Sherman Law).

Finally, in her warranty claim, Beasley alleged Tootsie Roll breached the implied warranty of merchantability because its products containing PHOs "were not fit for their ordinary purpose in that they were not safe, wholesome, and legal food products." Beasley alleged Tootsie Roll's products "were not fit for human consumption and had a value of $0." Beasley and the class "did not receive goods as impliedly warranted by [Tootsie Roll] to be

3

merchantable in that they were not fit for their ordinary purpose of human consumption."

The FAC sought damages, restitution, and other relief.

## B. *Procedural Background*

Beasley filed her initial complaint in this matter on January 25, 2021.[2] Tootsie Roll demurred, arguing (1) Beasley had not pleaded a cognizable injury, (2) her claims were preempted by federal law, (3) her claims were barred by the applicable statutes of limitations, and (4) she failed to state a claim under the UCL or for breach of the implied warranty of merchantability.

In June 2021, the trial court sustained the demurrer to the initial complaint with leave to amend. The court based its ruling on three grounds—lack of injury, the statutes of limitations, and federal preemption. First, the court concluded Beasley's allegations of economic and physical injury "do[] not establish standing under the UCL or resulting harm under the breach of warranty cause of action." Beasley's alleged economic injury (money she spent on Tootsie Roll products based on her " 'assumption[s]' " about their content) was not cognizable because her assumptions did not result from any alleged action by Tootsie Roll. As to physical injury, the court stated: "A product that increases the risk of bad health outcomes has not caused an injury until those health outcomes eventualize."

---

[2] Beasley previously filed (in December 2018) an identical complaint in the United States District Court for the Northern District of California. That action was dismissed without prejudice in December 2020.

In addition, after Beasley initiated the present action in superior court in January 2021, Tootsie Roll removed it to federal court, but the federal district court remanded the case back to superior court.

Second, the court found the limitations periods applicable to Beasley's claims were no longer than four years, so those claims—asserted in a complaint filed in January 2021 but seeking compensation for sales of products from 2010 through December 31, 2016—were "facially barred" unless an exception such as delayed discovery applied. The court concluded Beasley's allegations of delayed discovery were conclusory and insufficient, as they did not explain what factual information she learned that put her on notice of her potential claims.

Finally, in the section of its order entitled "Preemption," the court noted a congressional enactment, section 754 of the Consolidated Appropriations Act of 2016 (Pub.L. No. 114–113, div. A, tit. VII, § 754 (Dec. 18, 2015) 129 Stat. 2242, 2284) (section 754), specifies PHOs are not to be deemed violative of applicable provisions of the FDCA until June 18, 2018. The court also noted a provision of California's Sherman Law, Health and Safety Code section 110085, incorporates federal food additive regulations as California's regulations. The court stated that, "[a]lthough California might have adopted stricter or different regulations on the use of partially hydrogenated oil as a food additive, [Beasley] has not alleged that it has done so. [Beasley's] claims must therefore rely on the federal standard as incorporated into state law."

The court continued by stating section 754 reflected Congress's intent to prevent a "determination" that had been made by the federal Food and Drug Administration (FDA)—that PHOs are "not 'generally recognized as safe' "—"from having legal effect or being relied on until June 18, 2018." The court concluded Beasley's claims based on PHO use from 2010 to 2016 could not proceed. "It would conflict with Section 754, and would be inconsistent

5

with Health and Safety Code section 110085, if California were to give earlier effect to that particular FDA regulation than the FDA itself.”

After Beasley filed the FAC, Tootsie Roll again demurred. The court sustained the demurrer in October 2021, this time without leave to amend. Incorporating the analysis from its prior order sustaining the demurrer to the initial complaint, the court stated the FAC had failed to cure the deficiencies identified in that order.

The court entered judgment for Tootsie Roll in December 2021. Beasley appealed.

## II. DISCUSSION

### A. *Standard of Review*

“ ‘In reviewing an order sustaining a demurrer, we examine the operative complaint de novo to determine whether it alleges facts sufficient to state a cause of action under any legal theory.’ [Citation.] ‘ “ ‘ “We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law. . . . We also consider matters which may be judicially noticed.” . . . Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context.’ ” ’ ” (*Mathews v. Becerra* (2019) 8 Cal.5th 756, 768.) “ ‘In considering a trial court’s order sustaining a demurrer without leave to amend, “ ‘we review the trial court’s result for error, and not its legal reasoning.’ ” ’ [Citation.] We ‘ “affirm the judgment if it is correct on any theory.” ’ ” (*Munoz v. Patel* (2022) 81 Cal.App.5th 761, 771.)

We review the court’s denial of leave to amend for abuse of discretion. (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081.) “[W]e must decide whether there is a reasonable possibility the plaintiff could cure the defect with an amendment. [Citation.] If we find that an amendment could cure the defect, we conclude that the trial court abused its discretion and we

6

reverse; if not, no abuse of discretion has occurred. [Citation.] The plaintiff has the burden of proving that an amendment would cure the defect." (*Ibid.*)

## B. *Beasley's UCL Claim*

The UCL defines "unfair competition" to include "any unlawful, unfair or fraudulent business act or practice." (Bus. & Prof. Code, § 17200.) " 'Because Business and Professions Code section 17200 is written in the disjunctive, it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent.' " (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180 (*Cel-Tech*).) "Each is its own independent ground for liability under the unfair competition law [citation], but their unifying and underlying purpose 'is to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services.' " (*Shaeffer v. Califia Farms, LLC* (2020) 44 Cal.App.5th 1125, 1135.)

Beasley alleges Tootsie Roll's use of PHOs was both "unlawful" and "unfair" within the meaning of the UCL. We conclude she failed to state a cause of action under either prong and that portions of her claim are preempted by federal law.

## 1. The Unlawful Prong of the UCL

"By proscribing 'any unlawful' business practice, 'section 17200 "borrows" violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable." (*Cel-Tech, supra*, 20 Cal.4th at p. 180.) "To prevail on a claim under the unlawful prong of the unfair competition law, the plaintiff must show that a challenged advertisement or practice violates any federal or California 'statute or regulation.' " (*Shaeffer v. Califia Farms, LLC, supra*, 44 Cal.App.5th at p. 1136.) Beasley alleges Tootsie Roll's use of PHOs was unlawful because it

7

violated both federal and state law governing food additives, specifically the federal FDCA and California's Sherman Law.

a. *Tootsie Roll's Use of PHOs Did Not Violate the Federal FDCA*

In the set of statutory provisions relied on by Beasley, the FDCA prohibits the "introduction or delivery for introduction into interstate commerce of any food . . . that is adulterated." (21 U.S.C. § 331(a); see *id.*, § 331(c).) A food is deemed to be adulterated "if it is or if it bears or contains . . . any food additive that is unsafe within the meaning of" section 348 of title 21 of the United States Code (title 21). (21 U.S.C. § 342(a)(2)(C)(i).) The FDCA also defines the term "food additive" and specifies when an additive will be deemed to be "unsafe."

Specifically, section 321 of title 21 defines " 'food additive' " to mean "any substance the intended use of which results . . . in its becoming a component or otherwise affecting the characteristics of any food . . . if such substance is not generally recognized, among experts qualified by scientific training and experience to evaluate its safety, as having been adequately shown through scientific procedures (or, in the case of a substance used in food prior to January 1, 1958, through either scientific procedures or experience based on common use in food) to be safe under the conditions of its intended use." (21 U.S.C. § 321(s).) Finally, section 348 of title 21 states a food additive is deemed "unsafe" unless, for purposes relevant here, it complies with "a regulation issued under this section prescribing the conditions under which such additive may be safely used." (21 U.S.C. § 348(a)(2).)

In 2013 and again in 2015, the FDA addressed whether PHOs are generally recognized as safe (GRAS) for purposes of the statutory definition and regulation of "food additive[s]" in sections 321 and 348 of title 21. First, on November 8, 2013, the FDA "tentatively determined that there is no

8

longer a consensus among qualified scientific experts that PHOs . . . are safe for human consumption." (Tentative Determination Regarding Partially Hydrogenated Oils, 78 Fed.Reg. 67169, 67169 (Nov. 8, 2013) (Tentative Determination).) Specifically, the FDA stated its tentative determination was that "PHOs are no longer GRAS under any condition of use in food and therefore are food additives subject to [section 348 of title 21]." (*Ibid.*; see *id.* at p. 67170.) If the FDA's Tentative Determination were to become final, then "food manufacturers would no longer be permitted to sell PHOs . . . without prior FDA approval for use as a food additive." (78 Fed.Reg., *supra*, at p. 67169.)

As to the prior GRAS status of PHOs, the FDA stated in its Tentative Determination that certain commonly used PHOs were not listed as GRAS in the FDA's regulations but "have been considered GRAS (through a GRAS self-determination) by the food industry for use in food at levels consistent with good manufacturing practice based on a history of use prior to 1958." (78 Fed.Reg., *supra*, at p. 67171.) The FDA added that "[w]e are not aware that either FDA or the United States Department of Agriculture (USDA) granted any explicit prior sanction or approval for any use of PHOs in food prior to the 1958 Food Additives Amendment to the [FDCA]." (*Ibid.*)

On June 17, 2015, the FDA confirmed its Tentative Determination, finding that "there is no longer a consensus that PHOs . . . are generally recognized as safe for use in human food." (Final Determination Regarding Partially Hydrogenated Oils, 80 Fed.Reg. 34650, 34669 (June 17, 2015) (Final Determination).) The FDA's Final Determination did not take effect immediately. Instead, the FDA set a "compliance date" of June 18, 2018. (*Id.*

at p. 34668.)[3] The FDA stated the three-year window would allow it to receive and review petitions that could be submitted if the food industry "believes that it is possible to establish, by regulation, safe conditions of use of PHOs." (80 Fed.Reg., *supra*, at p. 34657; see *id.* at p. 34668.)

The FDA explained the three-year compliance period would "have the additional benefit of minimizing market disruptions by providing industry sufficient time to identify suitable replacement ingredients for PHOs, to exhaust existing product inventories, and to reformulate and modify labeling of affected products. Three years also provides time for the growing, harvesting, and processing of new varieties of edible oilseeds to meet the expected demands for alternative oil products and to address the supply chain issues associated with transition to new oils." (80 Fed.Reg., *supra*, at p. 34669.)[4]

On December 18, 2015, the President signed into law the Consolidated Appropriations Act of 2016 (the CAA). Section 754 of the CAA stated, consistent with the FDA's Final Determination, that PHOs would not be considered unsafe, and foods containing PHOs would not be considered adulterated, under the FDCA until the June 18, 2018 compliance date. (Pub.L. No. 114–113, div. A, tit. VII, § 754 (Dec. 18, 2015) 129 Stat. 2284.) Section 754 states: "No partially hydrogenated oils as defined in the order

---

[3] In a subsequent determination in 2018, the FDA further extended the compliance dates for the use of PHOs (with compliance dates varying for different products and uses). (Final Determination Regarding Partially Hydrogenated Oils, 83 Fed.Reg. 23358, 23359 (May 21, 2018).)

[4] In the Final Determination, the FDA noted (similar to its statement in the Tentative Determination) that certain commonly used PHOs, although not listed as GRAS or as approved food additives in FDA regulations, "have been considered GRAS by the food industry based on a history of use prior to 1958." (80 Fed.Reg., *supra*, at p. 34651.)

10

published by the Food and Drug Administration in the Federal Register on June 17, 2015 (80 Fed. Reg. 34650 et seq.) shall be deemed unsafe within the meaning of section 409(a) [of the FDCA, i.e., 21 U.S.C. § 348(a)] and no food that is introduced or delivered for introduction into interstate commerce that bears or contains a partially hydrogenated oil shall be deemed adulterated under sections 402(a)(1) or 402(a)(2)(C)(i) [of the FDCA, i.e., 21 U.S.C. §§ 342(a)(1) or 342(a)(2)(C)(i)] by virtue of bearing or containing a partially hydrogenated oil until the compliance date as specified in such order (June 18, 2018)." (*Ibid*.)[5]

Pursuant to section 754, Tootsie Roll's use of PHOs in its products prior to the June 18, 2018 compliance date specified by the FDA and confirmed by Congress did not violate the FDCA's prohibition on adulterated food (the theory of federal liability asserted by Beasley). As noted, the FDCA (1) prohibits the "introduction or delivery for introduction into interstate commerce of any food . . . that is *adulterated*" (21 U.S.C. § 331(a), italics added), and (2) states that a food is deemed to be adulterated "if it is or if it bears or contains . . . any food additive that is *unsafe* within the meaning of" section 348 of title 21. (21 U.S.C. § 342(a)(2)(C)(i), italics added.) But until June 18, 2018, no PHOs could be deemed "unsafe," and no food containing a PHO could be deemed "adulterated," within the meaning of the relevant statutory provisions. (Pub.L. No. 114–113, div. A, tit. VII, § 754 (Dec. 18, 2015) 129 Stat. 2284.) Because Beasley alleges only that Tootsie Roll used PHOs *before* the June 18, 2018 compliance date (i.e., during the 2010 to 2016

---

[5] In the Consolidated Appropriations Act of 2018, Congress enacted a substantively identical provision. (Pub.L. No. 115–141, div. A, tit. VII, § 738, (Mar. 23, 2018) 132 Stat. 348, 389–390.)

class period), she has failed to state a cause of action under the unlawful prong of the UCL predicated on a violation of the federal FDCA.[6]

While Beasley resists this conclusion, her arguments (some of which she presents as part of her challenge to the trial court's ruling that federal preemption applies here) are not persuasive. Beasley contends that, despite the 2018 compliance date set by the FDA and Congress, the use of PHOs was illegal under federal law for most of the 2010 to 2016 class period. Specifically, in a set of overlapping arguments, Beasley asserts (1) the use of PHOs was already unlawful before the FDA issued its Final Determination in June 2015 stating there was no longer a consensus that PHOs were safe, (2) the FDA's issuance of the Final Determination "immediately" and "automatically" made the use of PHOs illegal (despite the FDA's setting of a June 2018 compliance date), (3) section 754, which was enacted in December 2015 and expressly adopted the FDA's compliance date, "is not retroactive," so the pre-December 2015 use of PHOs violates federal law, and (4) both the Final Determination and section 754 only limit the FDA's ability to enforce the FDCA's provisions and do not establish the use of PHOs was lawful.[7]

---

[6] Our conclusion as to this portion of Beasley's UCL claim is not based on a determination that federal law preempts state law. We hold only that Beasley's allegations do not show a violation of the federal FDCA, so that purported violation cannot serve as the predicate for a claim under the unlawful prong of the UCL.

[7] In her reply brief, Beasley also argues that, in interpreting section 754, it would be improper to consider certain legislative history materials cited by Tootsie Roll in its appellate brief. We find it unnecessary to refer to those materials, so we need not address Beasley's argument on this point.

12

We reject these contentions.  As to the time period covered by section 754, that provision expressly states the use of PHOs is not prohibited until June 18, 2018.  Under section 754, no PHO "shall be deemed unsafe" within the meaning of section 348(a) of title 21, and no food containing a PHO "shall be deemed adulterated" under section 342(a)(1) or 342(a)(2)(C)(i) of title 21, "until the compliance date as specified in [the FDA's Final Determination] (June 18, 2018)."  (Pub.L. No. 114–113, div. A, tit. VII, § 754 (Dec. 18, 2015) 129 Stat. 2284.)

As Beasley notes, courts apply a presumption that legislation does not operate retroactively.  (*Landgraf v. USI Film Products* (1994) 511 U.S. 244, 265; *Myers v. Philip Morris Companies, Inc.* (2002) 28 Cal.4th 828, 841.)  But if "Congress has expressly prescribed the statute's proper reach," "there is no need to resort to judicial default rules."  (*Landgraf*, *supra*, at p. 280; see *Myers*, *supra*, at p. 841.)  Congress has done that here.  In section 754 (a provision directed solely at the issue of *when* the use of PHOs may be found to violate the FDCA), Congress specified PHOs cannot be deemed unsafe "until" June 18, 2018.  (Pub.L. No. 114–113, div. A, tit. VII, § 754 (Dec. 18, 2015) 129 Stat. 2284.)  In our view, it is not reasonable to interpret this language (as Beasley does) to mean that PHOs may be deemed unsafe from the beginning of the class period in 2010 until sometime in 2015 (either in June, when the FDA issued its Final Determination, or in December, when section 754 was enacted), then safe until the June 2018 compliance date, then unsafe again beginning in June 2018.  (See, e.g., *Backus v. Biscomerica Corp.* (N.D.Cal. 2019) 378 F.Supp.3d 849, 854–855 [reaching the same conclusion].)  We hold section 754 applies retroactively and establishes PHO use before June 18, 2018 did not violate the FDCA.

13

We disagree with Beasley's assertion that this safe harbor merely established a "non-enforcement period" for the FDA, while leaving in place a federal prohibition on PHOs that can be a ground for others (such as Beasley or other private plaintiffs) to impose liability for the use of PHOs prior to the compliance date. This narrow view is inconsistent with the text of section 754, which states categorically that PHOs shall not be deemed "unsafe" until June 18, 2018.[8] Moreover, the result urged by Beasley would undercut the purposes identified by the FDA in 2015 when it selected the three-year compliance period (after a notice-and-comment process in which commenters proposed "compliance dates ranging from immediate to over 10 years"). (80 Fed.Reg., *supra*, at p. 34668.)[9]

---

[8] Contrary to Beasley's brief suggestion, the one-sentence description of section 754 by the Congressional Research Service in its summary of the CAA (stating section 754 "[p]rohibits the FDA from deeming partially hydrogenated oils to be unsafe or any food containing a partially hydrogenated oil to be adulterated prior to June 18, 2018" <congress.gov/bill/114th-congress/house-bill/2029> [as of Nov. 30, 2022]) does not establish that the covered conduct was nonetheless illegal.

[9] Beasley argues in her reply brief (and her counsel maintained at oral argument) that section 754 should be treated as analogous to a different provision of the CAA (section 542) that restricts the expenditure of funds to prosecute marijuana offenses (while not purporting to end the federal prohibition on marijuana use). We disagree. Section 542, by its terms, addresses only the expenditure of funds. (Pub.L. No. 114–113, div. B, tit. V, § 542 (Dec. 18, 2015) 129 Stat. 2332–2333 ["None of the funds made available in this Act to the Department of Justice may be used, with respect to any of [listed states and other jurisdictions] to prevent any of them from implementing their own laws that authorize the use, distribution, possession, or cultivation of medical marijuana."].) Section 754, in contrast, does not merely restrict the use of funds to enforce a supposed prohibition on PHOs. Instead, section 754 establishes the conduct at issue was not prohibited— PHOs and the foods that contain them are not to be deemed unsafe or

Specifically, as noted, the FDA stated the compliance date would minimize market disruptions by providing industry sufficient time to identify suitable replacement ingredients, exhaust inventories, and reformulate products. (80 Fed.Reg., *supra*, at p. 34669.) The three-year period would also provide time for the growing, harvesting, and processing of alternative oil products and to address related supply chain issues. (*Ibid.*) A scheme establishing an immediate federal prohibition on PHO use (while merely limiting who can enforce it) would not achieve these benefits of the compliance date carefully selected by the FDA and confirmed by Congress.[10]

---

adulterated until June 18, 2018. (Pub.L. No. 114–113, div. A, tit. VII, § 754 (Dec. 18, 2015) 129 Stat. 2284.)

And we are not persuaded by Beasley's counsel's suggestion at oral argument that, because section 754 refers to statutes that in turn include provisions referring to "the Secretary" (i.e., the Secretary of Health and Human Services), we should construe section 754 as addressing only the FDA's authority. The provisions that section 754 actually cites— sections 348(a), 342(a)(1), and 342(a)(2)(C)(i) of title 21 (addressing when a food additive will be deemed unsafe, and some of the circumstances when a food will be deemed adulterated)—do not refer to "the Secretary." The fact that other portions of sections 348 and 342 of title 21 refer to "the Secretary" in connection with such matters as the promulgation of regulations (see 21 U.S.C. §§ 348(b)–(k), 342(d), (f)–(h)) does not, in our view, support counsel's argument or establish that section 754 itself is narrowly focused on limiting the FDA's authority.

[10] The cases cited by Beasley on this point—*Takhar v. Kessler* (9th Cir. 1996) 76 F.3d 995, 1002, and *Greene v. Five Pawns, Inc.* (C.D.Cal., Aug. 30, 2016, No. SA CV 15-1859 (DFMx)) 2016 U.S.Dist. LEXIS 187866, p. *31—are inapposite. In *Takhar*, the Ninth Circuit held the FDA was not required to follow notice-and-comment procedures in issuing a "Compliance Policy Guide" that identified circumstances in which it would consider regulatory action for extra-label drug use in animals. (*Takhar*, *supra*, at pp. 1001–1002.) The court explained it was the FDCA that made extra-label veterinary drug use illegal, and the guide "merely set forth which instances of such illegal use the FDA is likely to view as requiring it to take enforcement action and which

15

In light of our conclusion as to the reach of section 754 and the safe harbor it establishes, we need not address in detail Beasley's remaining set of arguments, i.e., that PHOs were already unlawful—either before the FDA's Final Determination, or after that determination and before the enactment of section 754—because they were not generally regarded as safe (GRAS). Whether PHOs were GRAS at different points in time is not dispositive here,[11] and their alleged non-GRAS status does not, without more, violate the FDCA.

Instead, as discussed, under the FDCA, the consequence of a "substance" not being GRAS is that (unless another statutory exception applies) the substance is a "food additive." (21 U.S.C. § 321(s).) A food

---

instances, while technically violative of the statute, will not ordinarily be subject to enforcement action." (*Takhar*, at p. 1002.) Similarly, the *Greene* court stated the FDA compliance policy at issue in that case "does not have the force of law because it is an interpretive rule" that was not subject to notice-and-comment procedures, and "the compliance policy is nowhere in the final rule." (*Greene v. Five Pawns, Inc.*, *supra*, 2016 U.S.Dist. LEXIS 187866, at p. *31.)

Here, in contrast to both *Takhar* and *Greene*, the FDA's Final Determination (including specifically the compliance date) was the product of a notice-and-comment procedure. (80 Fed.Reg., *supra*, at pp. 34650–34651, 34668–34669.) And Congress expressly confirmed the date selected by the FDA, stating PHOs may not be deemed to be unsafe before that date. (Pub.L. No. 114–113, div. A, tit. VII, § 754 (Dec. 18, 2015) 129 Stat. 2284.) Taken together, in our view, these determinations by the FDA and Congress establish that the use of PHOs prior to the compliance date cannot be found to have violated the relevant provisions of the FDCA.

[11] As noted, the FDA stated in its Tentative and Final Determinations that certain commonly used PHOs, while not listed as GRAS in the FDA's regulations (and apparently not expressly sanctioned or approved by the FDA), had long been considered GRAS by the food industry based on a history of use prior to 1958. (78 Fed.Reg., *supra*, at p. 67171; 80 Fed.Reg., *supra*, at p. 34651.)

16

additive, in turn, is "deemed to be unsafe" unless, as relevant here, it complies with a regulation prescribing the conditions of its use. (*Id.*, § 348(a)(2).) And a food that bears or contains an unsafe food additive is "deemed to be adulterated" (*id.*, § 342(a)(2)(C)(i)), thus running afoul of the FDCA's prohibition on the introduction of adulterated foods into interstate commerce (21 U.S.C. § 331(a)). In section 754, Congress established that, for PHOs (whether or not they might otherwise be considered GRAS), the latter steps in this statutory scheme—deeming PHOs or the foods that contain them to be "unsafe" or "adulterated"—cannot occur until June 18, 2018.

b. *Beasley Did Not State a Viable Claim Under the Unlawful Prong of the UCL Based on a Predicate Violation of California's Sherman Law; Alternatively, Federal Law Preempts That Portion of Her Unfair Competition Law Claim*

In addition to federal law, Beasley's claim under the UCL unlawful prong is based in part on her allegation that Tootsie Roll's use of PHOs violated California's Sherman Law. But Beasley does not contend the Sherman Law specifically prohibits the use of PHOs or sets a compliance date for their use that differs from the one established by the FDA and Congress. Instead, as relevant here, the Sherman Law is largely consistent with the federal FDCA, prohibiting the sale of "adulterated" food, including food that contains an unsafe food additive. (Health & Saf. Code, §§ 110620, 110545, 110555, 110445.) Indeed, as the trial court noted (and as Tootsie Roll notes in its appellate brief), the Sherman Law states that all federal regulations governing food additives are incorporated as California's food additive regulations. (Health & Saf. Code, § 110085.) The statute provides the State Department of Health Services may adopt food additive regulations that

17

differ from federal regulations (*ibid.*), but Beasley does not allege that has occurred for PHOs.[12]

Having no PHO-specific statutory or regulatory provision to rely on, Beasley alleges in the FAC (and argues briefly on appeal) that Tootsie Roll violated provisions of the Sherman Law stating a food is "adulterated" if it contains a "poisonous or deleterious substance" (Health & Saf. Code, § 110545) or if it contains a "food additive that is unsafe" (*id.*, § 110555).[13] We conclude Beasley's argument on this point does not establish the trial court erred by holding she had no viable UCL claim based on an underlying Sherman Law violation.

Our Legislature has decided state food additive regulations should align with federal regulations unless the appropriate state agency decides to chart a different course (Health & Saf. Code, § 110085), which Beasley does not allege has occurred with respect to PHOs. And as discussed in part II.B.1.a., *ante*, Tootsie Roll's use of PHOs during the 2010 to 2016 class

---

[12] Section 110085 of the Health and Safety Code states: "All food additive regulations and any amendments to the regulations adopted pursuant to the federal act [i.e., the FDCA] in effect on November 23, 1970, or adopted on or after that date, are the food additive regulations of this state. The department [i.e., the State Department of Health Services] may, by regulation, prescribe conditions under which a food additive may be used in this state whether or not these conditions are in accordance with the regulations adopted pursuant to the federal act." (Health & Saf. Code, § 110085; see *id.*, §§ 109930, 109910.)

[13] Section 110545 of the Health and Safety Code states in relevant part: "Any food is adulterated if it bears or contains any poisonous or deleterious substance that may render it injurious to health of man or any other animal that may consume it." Section 110555 of that code provides in relevant part: "Any food is adulterated if it is, bears, or contains any food additive that is unsafe within the meaning of Section 110445 [providing food additives are considered unsafe unless used in accordance with applicable regulations]."

18

period was permitted under federal law, and its products could not be deemed to be unsafe or adulterated. In this context, we conclude Beasley's invocation of general Sherman Law provisions about the meaning of "adulterated" food is not sufficient to show Tootsie Roll's use of the same PHOs during the same time period violated the Sherman Law. Beasley failed to state a cause of action under the unlawful prong of the UCL.[14]

As an alternative ground for affirmance, we conclude that, even assuming the provisions of the Sherman Law cited by Beasley could support a cause of action under the unlawful prong of the UCL, that claim would be preempted by federal law.

Federal law preempts state law where Congress so intends. (*Viva! International Voice for Animals v. Adidas Promotional Retail Operations, Inc.* (2007) 41 Cal.4th 929, 935–936 (*Viva!*).) The California Supreme Court has identified "four species of federal preemption: express, conflict, obstacle, and field." (*Id.* at p. 935.)

"First, express preemption arises when Congress 'define[s] explicitly the extent to which its enactments pre-empt state law. [Citation.] Pre-emption fundamentally is a question of congressional intent, [citation], and when Congress has made its intent known through explicit statutory language, the courts' task is an easy one.' [Citations.] Second, conflict preemption will be found when simultaneous compliance with both state and federal directives is impossible. [Citations.] Third, obstacle preemption arises when ' "under the circumstances of [a] particular case, [the challenged

_____

[14] Our conclusion on this point is, again, not based on a determination that federal law preempts state law. Instead, we conclude that, in light of the alignment of federal and state law, Beasley failed to state a cause of action under the UCL unlawful prong based on a violation of either one. As we next explain in the text, however, we conclude preemption applies here as well.

state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." ' [Citations.] Finally, field preemption, i.e., 'Congress' intent to pre-empt all state law in a particular area,' applies 'where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementary state regulation.' " (*Viva!*, *supra*, 41 Cal.4th at p. 936.) " ' "[C]ourts are reluctant to infer preemption, and it is the burden of the party claiming that Congress intended to preempt state law to prove it." ' " (*Ibid.*)

We conclude obstacle preemption applies here. Permitting the use of broad state statutory provisions such as those cited by Beasley (governing "adulterated" foods) to impose liability for PHO use prior to the federally established compliance date would " ' "stand[] as an obstacle" ' " (*Viva!*, *supra*, 41 Cal.4th at p. 936) to the achievement of Congress's evident purpose in enacting section 754, i.e., to confirm the June 18, 2018 compliance date that the FDA established after careful consideration and a notice-and-comment proceeding.[15] (Pub.L. No. 114–113, div. A, tit. VII, § 754 (Dec. 18, 2015) 129 Stat. 2284; 80 Fed.Reg., *supra*, at pp. 34668–34669.)

As noted, the FDA explained the three-year compliance period it selected would "minimiz[e] market disruptions" because it would "provid[e] industry sufficient time to identify suitable replacement ingredients for PHOs, to exhaust existing product inventories, and to reformulate and modify labeling of affected products." (80 Fed.Reg., *supra*, at p. 34669.) The

---

[15] Since Beasley (here and in her remaining claims, which we discuss in pts. II.B.1.b. and II.B.2., *post*) relies on broad state statutory provisions and common law doctrines, rather than any state statute or regulation that specifically addresses PHOs, we need not decide whether the preemption analysis might differ if such a provision were at issue.

three-year window would also allow time to transition to new oil products and address related supply chain issues.  (*Ibid.*)  Use of state law to penalize the use of PHOs prior to the compliance date—making their use illegal during a period when Congress intended it to be legal—would stand as an obstacle to the achievement of these benefits.

Beasley's arguments to the contrary are meritless.  First, we have already rejected (in pt. II.B.1.a., *ante*) her contention that section 754 is of limited effect, either because it is not retroactive or because it only restricts the FDA's ability to penalize PHO use during the compliance period (conduct that allegedly remained unlawful).  As discussed, we hold section 754 is retroactive and establishes PHO use before the compliance date was legal.

Second, as Beasley notes, in areas traditionally regulated by the states, there is a presumption that federal law does not preempt state law " 'unless that was the clear and manifest purpose of Congress.' "  (*Viva!, supra*, 41 Cal.4th at p. 938.)  For the reasons discussed, we conclude Congress's adoption of the FDA's compliance date establishes Congress's clear and manifest purpose that use of PHOs prior to that date would be legal, thus rebutting the presumption against preemption.

Third, we reject Beasley's contention that a statement by the FDA in its Final Determination precludes a finding of preemption.  During the notice-and-comment process that led to the Final Determination, some commenters asked the FDA to take a position as to "the effect of [the FDA's order] on state and local laws regarding PHOs."  (80 Fed.Reg., *supra*, at p. 34655.)  The FDA responded that it would not take a position but that it believed there was unlikely to be a conflict between federal and state law. (*Ibid.*)

21

The FDA stated: "There is no statutory provision in the [FDCA] providing for express preemption of any state or local law prohibiting or limiting use of PHOs in food, including state or local legislative requirements or common law duties. As with any Federal requirement, if a State or local law requirement makes compliance with both Federal law and State or local law impossible, or would frustrate Federal objectives, the State or local requirement would be preempted. [Citations.] We decline to take a position regarding the potential for implied preemptive effect of this order on any specific state or local law; as such matters must be analyzed with respect to the specific relationship between the state or local law and the federal law. FDA believes, however, that state or local laws that prohibit or limit use of PHOs in food are not likely to be in conflict with federal law, or to frustrate federal objectives." (80 Fed.Reg., *supra*, at p. 34655.)

Nor are we persuaded that the last sentence of the FDA's statement on this issue (the sentence that Beasley emphasizes) should weigh heavily in resolving the preemption question presented here. The FDA couched the sentence in the context of an overall statement that it would not take a position on preemption and an acknowledgment that each situation requires an analysis of the specific state and federal laws at issue (80 Fed.Reg., *supra*, at p. 34655), such as the analysis we undertake here. The FDA's statement about the potential for preemption also does not mention (or reflect any specific focus on) the compliance date the FDA set elsewhere in its order (*ibid.*), and we do not read the FDA's statement as an endorsement of a scheme in which federal and state laws have different compliance dates.[16]

_____

[16] We need not and do not consider whether any other difference between federal and state laws governing PHOs would trigger preemption concerns.

For the reasons we have discussed, we conclude that construing California statutory or common law to penalize PHO use before the compliance date selected by the FDA and ratified by Congress would present an obstacle to the accomplishment of the objectives of federal law.

Beasley next argues we should not find preemption here because section 754 does not expressly refer to state law or preemption. We agree this is not a case of express preemption. But as discussed, we conclude obstacle preemption (a species of implied preemption) applies here in light of Congress's adoption of the FDA's compliance date.

Finally, the cases Beasley cites pertaining to federal preemption of state food regulations do not alter our conclusion. In *Reid v. Johnson & Johnson* (9th Cir. 2015) 780 F.3d 952, 955, 959, 961–963 and *Hawkins v. Kroger Co.* (9th Cir. 2018) 906 F.3d 763, 767, 769, 771–772, the Ninth Circuit held federal law did not preempt certain state law claims pertaining to the *labeling* of products containing PHOs. Neither case addressed whether claims related to the *use* of PHOs were preempted.[17]

In another set of decisions, courts held that, under the circumstances presented, federal statutes did not preempt state law regulating or prohibiting certain foods. (*Association des Éleveurs de Canards v. Becerra* (9th Cir. 2017) 870 F.3d 1140, 1142, 1146, 1152–1153 [federal statute regulating poultry products did not preempt state statute prohibiting force-feeding of birds to produce foie gras]; *Empacadora de Carnes de Fresnillo v. Curry* (5th Cir. 2007) 476 F.3d 326, 333–334 [federal meat inspection statute

---

[17] As Beasley notes in her reply brief, the defendant in *Hawkins* argued the plaintiff's claims about PHO use were preempted. (*Hawkins v. Kroger Co.*, *supra*, 906 F.3d at p. 772.) But the Ninth Circuit declined to consider the issue, which had not been addressed by the district court or fully briefed on appeal. (*Id.* at p. 773.)

23

did not preempt state ban on production or sale of horsemeat for human consumption]; *Cavel Intern., Inc. v. Madigan* (7th Cir. 2007) 500 F.3d 551, 553–554 [same]; *Chinatown Neighborhood Ass'n v. Harris* (9th Cir. 2015) 794 F.3d 1136, 1139, 1142–1144 [federal fishery management statute did not preempt state ban on sale of shark fins].)

These cases are distinguishable. Each one involved a specific analysis of the federal and state statutory schemes at issue, and contrary to Beasley's suggestion, they do not stand for the broad proposition that a state law imposing food regulations can never be preempted by federal law. Moreover, each case considered whether a broad federal regulatory scheme preempted a state law prohibiting specific conduct. (*Association des Éleveurs de Canards v. Becerra, supra*, 870 F.3d at pp. 1152–1153 [federal law regulating " 'official establishments' " where slaughter and processing occurred did not preempt state statute prohibiting a feeding practice "that occurs far away from [those] official establishments"]; *Empacadora de Carnes de Fresnillo v. Curry, supra*, 476 F.3d at p. 334 [state prohibition on sale of horse meat was not an obstacle to federal statutory objectives of ensuring quality and proper labeling of meat]; *Cavel Intern., Inc. v. Madigan, supra*, 500 F.3d at pp. 553–554 [federal meat inspection statute applies to horse meat if it is produced but does not require states to allow the slaughter of horses for human consumption]; *Chinatown Neighborhood Ass'n v. Harris, supra*, 794 F.3d at pp. 1139–1140, 1142–1144 [federal statute vesting federal government with " 'exclusive fishery management authority' " did not preempt state ban on possession or sale of shark fins in the state].)

The scenario here is the opposite—Beasley relies on general state laws, while federal law expressly sets a compliance date for PHO use. (See *Beasley v. Lucky Stores, Inc.* (N.D.Cal. 2019) 400 F.Supp.3d 942, 953 [drawing the

24

same distinction].) We conclude that, under the circumstances presented here, federal law permitting specific conduct (PHO use before the 2018 compliance date) preempts Beasley's attempt to use general provisions of state law to penalize the same conduct, an effort that would stand as an obstacle to the achievement of federal objectives.

### 2. Beasley Failed To State a Claim Under the Unfair Prong of the UCL; Alternatively, Federal Law Preempts That Portion of Her UCL Claim

Beasley contends Tootsie Roll's use of PHOs was "unfair" within the meaning of the UCL. (See *Cel-Tech*, *supra*, 20 Cal.4th at p. 180 [practice that is not unlawful may nevertheless be unfair practice under UCL].) Invoking multiple tests of unfairness applied in the case law, Beasley argues that Tootsie Roll's conduct caused harm to consumers that was not outweighed by any countervailing benefits and that the conduct violated public policy. (See *Davis v. Ford Motor Credit Co. LLC* (2009) 179 Cal.App.4th 581, 594–597 [outlining approaches to determining whether a business practice is "unfair" under the UCL].)

Tootsie Roll responds that, regardless of which test of unfairness is applied, Beasley has not stated a claim because the UCL cannot be used to prohibit conduct that is permitted by law. We agree. In *Cel-Tech*, our Supreme Court explained: "If the Legislature has permitted certain conduct or considered a situation and concluded no action should lie, courts may not override that determination. When specific legislation provides a 'safe harbor,' plaintiffs may not use the general unfair competition law to assault that harbor." (*Cel-Tech*, *supra*, 20 Cal.4th at p. 182.) We have concluded above that Congress provided a safe harbor for PHO use before the June 18, 2018 compliance date. The definition of "unfairness" under the UCL may not be stretched to encompass this legally permitted conduct.

25

As Beasley notes, the *Cel-Tech* court, while holding courts may not use the UCL to prohibit conduct the Legislature permits, also stated that "the Legislature's mere failure to prohibit an activity does not prevent a court from finding it unfair." (*Cel-Tech, supra*, 20 Cal.4th at p. 184.) But the present case is not one of legislative silence. Congress has expressly addressed the legal status of PHOs and has determined their use before the compliance date was permitted.[18]

Alternatively, even if Tootsie Roll's conduct did not fall within a " 'safe harbor' " and thus outside the scope of the UCL as construed by our Supreme Court as a matter of state law (*Cel-Tech, supra*, 20 Cal.4th at p. 182), Beasley's claim under the unfair prong of the statute (like her claim under the unlawful prong) would be preempted by federal law for the reasons we have discussed in part II.B.1.b., *ante.*

## C. *Federal Law Preempts Beasley's Claim for Breach of the Implied Warranty of Merchantability*

In her second cause of action in the FAC, Beasley alleged Tootsie Roll breached the implied warranty of merchantability because its products contained PHOs and thus were "not fit for their ordinary purpose of human consumption."

Under the California Uniform Commercial Code, "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." (Cal. U. Com. Code, § 2314, subd. (1).) This implied warranty requires that goods "[a]re fit for the

---

[18] Contrary to Beasley's suggestion, our holding is not based on a narrow construction of the "public policy" test for unfairness under the UCL. We hold simply that, under *Cel-Tech*, whichever test of unfairness might otherwise be applied, the UCL may not be used to prohibit legislatively permitted conduct.

ordinary purposes for which such goods are used." (*Id.*, § 2314, subd. (2)(c).) Accordingly, to breach the implied warranty, a product must lack "even the most basic degree of fitness for ordinary use." (*Mocek v. Alfa Leisure, Inc.* (2003) 114 Cal.App.4th 402, 406.) In addition, "[w]hen the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him." (Cal. U. Com. Code, § 2316, subd. (3)(b).)

The parties present brief arguments as to whether (independent of preemption) Beasley's allegations are sufficient to state a cause of action for implied warranty breach. Tootsie Roll, citing *Backus v. Biscomerica Corp.* (N.D.Cal., Mar. 27, 2017, No. 16-cv-03916-HSG) 2017 U.S.Dist. LEXIS 44832, argues Beasley "did not claim [Tootsie Roll's products] were not fit for their intended purpose—to be eaten," but only complained "they contain PHOs, and thus were unhealthy." Tootsie Roll also asserts Beasley has not stated a claim because PHO was listed as an ingredient on the product label, so an examination of the product should have revealed the alleged deficiency. Beasley, citing *Hawkins v. Kroger Co.* (S.D.Cal. 2021) 512 F.Supp.3d 1079, responds that these arguments implicate disputed factual issues and do not show a failure to state a claim.

We decline to resolve these points, as they were not addressed by the trial court, are the subject of only limited appellate briefing by the parties, and are unnecessary to our resolution of the present appeal. Instead, we conclude Beasley's implied warranty claim is barred because it is preempted by federal law. For the reasons discussed in part II.B.1.b., *ante*, federal law permitting PHO use before the 2018 compliance date preempts Beasley's

attempt to use a general state law doctrine (here, the implied warranty of merchantability) to impose liability for the same conduct.

## III. DISPOSITION

The judgment is affirmed.  Tootsie Roll shall recover its costs on appeal.

STREETER, J.

WE CONCUR:

POLLAK, P. J.
BROWN, J.

Trial Court:  Superior Court of California, County of Alameda

Trial Judge:  Hon. Brad Seligman

Counsel:      The Weston Firm, Gregory S. Weston for Plaintiff and
              Appellant.

              Donahue Fitzgerald, David M. Jolley for Defendant and
              Respondent.